# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FORTIS ADVISORS, LLC, a
Delaware limited liability company,
as the Representative of the former
shareholders of Unknown Worlds
Entertainment,

        Plaintiff,

    v.

KRAFTON, INC.,

        Defendant.

C.A. No. 2025-0805-LWW

## OPINION

Date Submitted: January 9, 2026
Date Decided: March 16, 2026

Brian C. Ralston, Nicholas D. Mozal, Ryan M. Crowley, & Megan A. Minnich, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; John Stokes, Kenneth J. Halpern, & Peter Brody, STRIS & MAHER LLP, Cerritos, California; Dmitry Slavin & Jacqueline Sahlberg, STRIS & MAHER LLP, Washington, DC; *Attorneys for Plaintiff Fortis Advisors, LLC*

Rudolf Koch, Matthew W. Murphy, Nicole Henry, & Sandy Xu, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Atif Khawaja, John P. Del Monaco, Haley S. Stern, & Madeleine M. Xu, KIRKLAND & ELLIS LLP, New York, New York; Madelyn A. Morris & Christopher Stackhouse, KIRKLAND & ELLIS LLP, Chicago, Illinois; Kristin Rose, KIRKLAND & ELLIS LLP, Los Angeles, California; *Attorneys for Defendant Krafton, Inc.*

**WILL, Vice Chancellor**

Unknown Worlds Entertainment is a video game studio best known for *Subnautica*—an underwater survival adventure. Eager to capture its creative magic, South Korean gaming conglomerate Krafton Inc. acquired Unknown Worlds in 2021 for $500 million upfront plus up to $250 million in contingent earnout payments. To secure the deal, Krafton contractually guaranteed that Unknown Worlds' founders—Charlie Cleveland and Max McGuire—along with CEO Ted Gill, would retain operational control and could only be fired for cause.

As Unknown Worlds prepared to release its hotly anticipated sequel, *Subnautica 2*, the parties' relationship fractured. Internal projections showed the new title generating significant revenue that would easily trigger the earnout. Fearing he had agreed to a "pushover" contract, Krafton's CEO consulted an artificial intelligence chatbot to contrive a corporate "takeover" strategy.

A campaign to seize control of the studio followed. Krafton locked Unknown Worlds out of its own publishing platform to prevent the release of *Subnautica 2*. It unilaterally posted critical messages on Unknown Worlds' website. And it abruptly terminated Cleveland, McGuire, and Gill from their leadership positions, citing a single reason: a purported lack of game readiness.

After Fortis Advisors LLC sued on behalf of Unknown Worlds' former stockholders, Krafton changed tactics. It dropped its argument that the executives were fired for seeking to prematurely release *Subnautica 2*. Instead, it claimed

1

Cleveland and McGuire had secretly entered semi-retirement and that all three leaders had executed massive downloads of company data.

In the first phase of this bifurcated lawsuit, Fortis asks me to determine whether Krafton breached the transaction agreement by firing Cleveland, McGuire, and Gill, and usurping their operational control. Fortis proved its claims after an expedited trial. Krafton's newly manufactured justifications for the terminations are pretextual. Cleveland and McGuire had taken on limited roles, but that was long known to and accepted by Krafton. As for the data downloads, the former employees were acting to protect the studio's work product amid Krafton's takeover attempt. They kept the data confidential and promptly returned it.

To remedy these breaches, Gill is reinstated as CEO of Unknown Worlds with full operational authority over the studio. Because restoring him vindicates the sellers' operational rights, I decline to return Cleveland and McGuire to the peripheral roles they occupied before their terminations. Gill—with his authority restored—may proceed with the early access release of *Subnautica 2* when he deems it appropriate.

To ensure this specific performance remedy is not illusory, the base earnout period is equitably extended by the duration of Gill's ouster. Whether Krafton's actions wrongfully impaired the earnout, and whether any resulting money damages are owed, are reserved for the second phase of this litigation.

## I. BACKGROUND

The following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1]

### A. Unknown Worlds' Creation

Charles (Charlie) Cleveland is a "creative vision[ary]" whose life has been defined by a passion for gaming.[2] After a childhood engrossed in video, board, and role-playing games, Cleveland discovered his calling while studying computer engineering in college. Rather than pursue a traditional career path, he spent a summer "lock[ing] [him]sel[f]" in a rented house in Vermont, emerging only when he and his friends had built a playable game.[3] He was "hooked."[4] Cleveland leveraged the game he built over the summer to land his first job at a game company in Boston.[5]

---

[1] Stipulated and Am. Pre-trial Order (Dkt. 132) ("PTO"). Trial occurred over three days, during which six fact and two expert witnesses testified live. The trial record includes 1,538 joint exhibits, including 17 deposition transcripts. Trial testimony is cited as "[Name] Tr." *See* Nov. 17-19, 2025 Trial Tr. (Dkts. 151-53). Exhibits are cited by the numbers provided on the parties' joint exhibit list as "JX __," unless otherwise defined, and pin cites are to the joint exhibit pagination. *See* Trial Ex. List (Dkt. 131). Deposition transcripts are cited as "[Name] Dep." *See* Notice of Lodging of Deps. (Dkt. 139).

[2] Cleveland Tr. 692.

[3] *Id.* at 685.

[4] *Id.*

[5] *Id.*

Cleveland's next spark of inspiration came in 2000, when he played a video game called *Counter-Strike*.[6] *Counter-Strike* was a "revolution" to Cleveland because it was a user-made modification (or "mod") built atop an existing game.[7] He spent the next 18 months developing his own mod called *Natural Selection*.[8]

In creating *Natural Selection*, Cleveland pioneered an "early access" development process that would become his "secret sauce."[9] The early access model created a "symbiotic relationship" between the developer and players.[10] Players would collaborate with the project, giving them a sense of "ownership" over and enthusiasm for it.[11] Cleveland, in turn, gained immediate feedback on whether features were "landing," allowing him to "iterate" until the game was "truly special."[12]

The process worked, and *Natural Selection* was "successful enough" that Cleveland realized he could "do this for a job."[13] He formed Unknown Worlds

---

[6] *Id.* at 685-86.

[7] *Id.* at 686.

[8] *Id.*

[9] *Id.* at 687-88; Gill Tr. 16.

[10] Cleveland Tr. 689; Gill Tr. 13.

[11] Cleveland Tr. 689.

[12] *Id.*; Gill Tr. 13.

[13] Cleveland Tr. 686.

Entertainment in 2001 as a California corporation.[14]  Cleveland moved to San Francisco to seek investors for the nascent company.[15]

### B. The "Magical Pair"

Soon after Cleveland went West, he was joined by his friend Adam (Max) McGuire (with Cleveland, the "Founders").[16]  The two had met in the early aughts while McGuire was working at a video game studio and Cleveland was creating *Natural Selection*.[17]  McGuire saw *Natural Selection*'s promise and spent his nights and weekends developing the mod with Cleveland.[18]  After *Natural Selection* launched, Cleveland and McGuire began to brainstorm on a commercial sequel, and McGuire joined Unknown Worlds as a co-founder.[19]

To sell *Natural Selection 2* commercially, Cleveland and McGuire could not rely on an existing game.  Rather, they had to "wr[i]te [their] own engine" from scratch.[20]  This technical challenge revealed that they were a "magical pair" with a

---

[14] *Id.* at 686; *see* PTO ¶¶ 17, 19.

[15] Cleveland Tr. 686.

[16] *Id.* at 686-87; *see* PTO ¶ 21.

[17] McGuire Tr. 228; *see also* Cleveland Tr. 686.

[18] McGuire Tr. 228-29.

[19] *Id.* at 229.

[20] Cleveland Tr. 690.  A mod cannot be sold commercially because it "require[s] another game to play it." *Id.*

complementary dynamic.[21]  Cleveland "was the creative side" who "design[ed] the game," and McGuire "was the technical side" who "implement[ed] . . . the code."[22] Their combined talents enabled the small studio to employ complex, in-house technologies rarely seen among independent developers.

## C.  *Subnautica*'s Origin

*Natural Selection 2* was released by Unknown Worlds via early access in October 2012.[23]  Like its predecessor, it was a first-person shooter game.[24]  Two months later, national tragedy struck with the Sandy Hook Elementary School shooting.  Cleveland was deeply affected and challenged himself to "make a game without guns."[25]

The result was *Subnautica*.  Cleveland conceived of an underwater survival exploration game set on an alien planet.[26]  Working with a colleague while McGuire refined a different game, Cleveland built a prototype in just two weeks.[27]  The

---

[21]  Park Tr. 483-84 (describing the "magical pair [as] the key success factor for the company," where Cleveland provides the "creative vision and [McGuire] is the genius engineer who helps him realize it"); *see also* Kim Tr. 389-90 (describing Cleveland and McGuire as "two wheels being driven together").

[22] McGuire Tr. 229-30.

[23] PTO ¶ 22.

[24] *Id.* ¶ 20; Cleveland Tr. 690-91.

[25] Cleveland Tr. 691.

[26] *Id.*; *see* Gill Tr. 18.

[27] Cleveland Tr. 690-91; McGuire Tr. 230-31.

Unknown Worlds team recognized the promise in the rough concept and eventually made bringing it to life the studio's primary focus.[28]

Developing the game took great attention to detail. McGuire synthesized into code research on sunlight absorption in the deep ocean, building a realistic custom lighting system.[29] Meanwhile, Cleveland spent countless hours creating an ecosystem populated by creatures and plants that interacted with the player's flashlight.[30] Through Cleveland's vision and McGuire's technical prowess, the game became a stunning, immersive experience. Players were transported to a vibrant alien ocean teeming with life, from bioluminescent flora to colossal sea creatures—a place where light filtered through water to reveal a world that felt startlingly real.[31]

## D. Early Access and Launch

Consistent with Unknown Worlds' commitment to collaborative development, *Subnautica* was released in early access in late 2014.[32] Players crash-landed on an alien ocean planet and had to scavenge for resources while uncovering a "mysterious

---

[28] Cleveland Tr. 691; McGuire Tr. 232.

[29] McGuire Tr. 233-34 (discussing researching papers from the Oceanographic Institute about the effect of phytoplankton on sunlight absorption in the deep ocean, and his analysis of visual effects in film); *see* PTO ¶ 27.

[30] PTO ¶ 28; *see also id.* ¶ 29 (describing Cleveland's initial direction of *Subnautica*, involving "a process of constant judgment and discussion and evolution").

[31] Gill Tr. 18; *see also* JX 218 at 13 (describing the game's "diverse underwater world" that is "teeming with wildlife and mysteries").

[32] McGuire Tr. 236; PTO ¶¶ 30-31; *see also* Gill Tr. 10 ("*Subnautica* . . . became kind of a wonderful example for the entire industry about how to do early access."); JX 1095 at 14.

7

. . . sci-fi [tale]."[33]  The project remained in early access for four years, during which the Unknown Worlds team incorporated player feedback to improve the experience.[34]

Unknown Worlds globally released the full version of *Subnautica* in 2018.[35] The game was a massive critical and commercial phenomenon.[36]  It remains the studio's "evergreen IP" and continues to drive significant revenue years after its release.[37]

### E.    Leveling Up

As the studio expanded, the administrative load on the Founders grew. Cleveland recognized that managing both the business and creative side of Unknown Worlds was unsustainable.  To divide these responsibilities, Edward (Ted) Gill was hired as Unknown Worlds' President in December 2018.[38]

Gill's history with the studio reached back a decade earlier, beginning when he rented office space "a couple [of] doors down" from Unknown Worlds in San Francisco.[39]  A "lifelong video game fan," Gill "knocked on the door" to introduce

---

[33] Gill Tr. 18; *see* PTO ¶ 25.

[34] PTO ¶¶ 31, 33; JX 1095 at 14.

[35] PTO ¶ 33.

[36] Cleveland Tr. 691-93; Gill Tr. 10; JX 1095 at 14; Park Tr. 514; *see* PTO ¶ 34.

[37] Gill Tr. 24.

[38] Gill Tr. 6-7; PTO ¶ 32; Cleveland Tr. 687.

[39] Gill Tr. 6-7.

himself and became fast friends with Cleveland and McGuire.[40] Gill also became an ardent fan of the studio's work.[41] When he reached a "fork in the road" in his career years later, he "enthusiastically accepted" the Founders' offer to join the team.[42]

Gill's arrival marked a maturation of the studio. He took over the "operational tasks and the management of the studio," handling finance, strategy, and partnerships.[43] This structure transformed the "magical pair" into a formidable trio. With Gill managing the business and Cleveland and McGuire making the games, Unknown Worlds went from an indie developer to a sophisticated, multi-project organization.[44]

## F.     Dual Tracks

Although *Subnautica* was a breakout hit, the Founders were not content for Unknown Worlds to be defined by a single franchise. They recognized the value in

---

[40] *Id.*

[41] *Id.* at 14, 18 (describing *Subnautica* as a "special" game with a "unique" story); PTO ¶ 32.

[42] Gill Tr. 7.

[43] *Id.* at 218; *see id.* at 57 (explaining that "studio operations were 100 percent [his] responsibility"); *see* PTO ¶ 32.

[44] Cleveland Tr. 687 ("I felt like the company could grow and do a lot better if we had someone dedicated to the business itself."); *see also* Gill Tr. 11, 25.

sustaining their existing community while continuing to take creative risks. This objective led to the pursuit of a dual-track strategy.

The studio began developing *Subnautica*: *Below Zero*—a standalone expansion to the flagship title.[45] Cleveland and McGuire did not lead the effort. Instead, they entrusted the sequel to a team led by "industry veteran" David Kalina, which allowed them to focus on an ambitious new project called *Moonbreaker*.[46]

*Moonbreaker* was a digital miniatures game designed to capture the feel of tabletop strategy games Cleveland and McGuire loved as children.[47] This passion project demanded the Founders' full attention. Though Cleveland coached Kalina, he "didn't design anything on *Below Zero*" and "didn't work on *Below Zero* at all," concentrating exclusively on *Moonbreaker*.[48] McGuire similarly served only as a high-level resource on *Below Zero* while he architected *Moonbreaker*.[49] This division of labor established an institutional approach where the Founders created new IP, and trusted team members managed the established franchise.[50]

---

[45] *See* Gill Dep. 36 (describing *Below Zero* as an "expandalone" or "mini sequel" to *Subnautica*).

[46] Gill Tr. 25; Cleveland Tr. 694, 699.

[47] *See* Gill Tr. 21; *see also* Cleveland Tr. 696.

[48] Cleveland Tr. 693-94; *see also id.* at 699 (testifying he worked "full time on *Moonbreaker* . . . [which] required all [his] attention" (emphasis added)).

[49] McGuire Tr. 236, 239; *see also* Gill Tr. 16 (noting McGuire was not the tech lead on *Below Zero*); JX 1034.

[50] *See* Gill Tr. 11.

10

While the Founders prototyped *Moonbreaker*, *Below Zero* entered early access in January 2019.[51] In its initial form, *Below Zero* had a "[l]imited world" and "limited mechanics."[52] But the *Below Zero* team used player feedback to transform the game. They expanded the story line with unique biomes, vehicles, and creatures before the game's official release in May 2021.[53]

The finished project was another success. *Below Zero* boosted sales of the original *Subnautica* game and proved Unknown Worlds' capability as a multi-game studio.[54] Today, the *Subnautica* franchise has sold over 17.5 million copies and exceeded $300 million in gross revenue.[55]

## G.    The Sale Process

Unknown Worlds grew to 43 employees across nine countries.[56] The Founders, hoping to expand the studio's international reach, sought to bring in "additional capabilities"—particularly in marketing.[57] To do so, they contacted several large video game publishers to solicit a strategic minority investment.[58] They

---

[51] PTO ¶ 35; JX 1095 at 14.

[52] JX 1179 at 21.

[53] PTO ¶ 36; JX 1179 at 21.

[54] PTO ¶ 37; Gill Tr. 11 ("This is kind of the history of hit game after hit game.").

[55] PTO ¶ 38.

[56] JX 218 at 23.

[57] Gill Tr. 27.

[58] *Id.* at 28; Cleveland Tr. 694-95.

were met with enthusiasm from over 30 companies, many of which expressed interest in a full acquisition.[59]

Because Unknown Worlds was financially stable, the Founders did not "have to sell."[60] This leverage allowed them to weigh the options that would best secure the studio's long-term future. They narrowed the field to nine candidates, and then to three finalists.[61]

Price was never the overriding consideration. As the Founders told potential acquirers, they were looking for a partner who respected the studio's "community-based development" model.[62] Above all, they hoped to maintain a degree of operational independence that would allow them to continue making games "on [their] own terms."[63]

Krafton, a South Korean video game publisher, emerged as the top choice.[64] Krafton was best known for *PUBG: Battlegrounds*, a battle royale game that had generated hundreds of millions in revenue.[65] It was seeking to expand its portfolio

---

[59] Gill Tr. 28.

[60] Cleveland Tr. 698-99; Gill Tr. 29-30.

[61] Gill Tr. 29.

[62] *Id.*; *see also* McGuire Tr. 237; Cleveland Tr. 698; JX 218 at 3.

[63] Cleveland Tr. 698.

[64] Gill Tr. 30.

[65] PTO ¶ 16; *see PUBG: Battlegrounds*, PUBG, http://pubg.com/en/main (last visited Jan. 26, 2026); Gill Tr. 126; Kim Tr. 382-83.

12

and "excited about [Unknown Worlds'] development methodology and early access" model.[66]

The parties' perceived fit crystalized in a meeting between Cleveland and Krafton's Chief Executive Officer, Changhan (CH) Kim. Cleveland told Kim that he did not "think it's possible for [him] to stop making games" and that he "want[ed] to do this forever."[67] In response, Kim assured the Founders that Krafton would preserve the studio's creative autonomy and long-term vision.[68] Krafton offered Unknown Worlds a "menu" of superior resources that it could opt into at the Founders' election.[69]

## H. The Equity Purchase Agreement

On October 29, 2021, Krafton and Unknown Worlds entered into an Equity Purchase Agreement ("EPA").[70] Krafton purchased 100% of Unknown Worlds' outstanding equity for a $500 million upfront payment.[71] Cleveland, McGuire, and

---

[66] Gill Tr. 30.

[67] Cleveland Tr. 766-67; Kim Tr. 389-92.

[68] Kim Tr. 392-93; Gill Tr. 31-32; *see also* Cleveland Tr. 695-97.

[69] Gill Tr. 31.

[70] PTO ¶ 46; JX 241; JX 242 ("EPA"). The EPA is governed by Delaware law. EPA § 11.14.

[71] PTO ¶ 46.

Gill (defined in the EPA as the "Key Employees") and other Unknown Worlds team members also became eligible for a $250 million earnout payment.[72]

Eligibility for the performance-based earnout is determined by Unknown Worlds' revenue through December 31, 2025, with an option to extend the earnout period through June 2026.[73] The earnout formula is highly leveraged. If Unknown Worlds surpasses a revenue threshold of $69.8 million, Krafton must pay $3.12 for each additional dollar of revenue generated, up to the $250 million cap.[74]

To give them runway to achieve these targets, the Key Employees secured a measure of autonomy. The EPA grants them "operational control" of Unknown Worlds "in all material respects."[75] This authority allows the Key Employees to direct the "product roadmap, launch, planning, partnering, budgeting and employee matters."[76] Their control rights endure so long as any of the Key Employees remains employed by Unknown Worlds.[77]

The Key Employees, in exchange, agreed to run Unknown Worlds in the "[o]rdinary [c]ourse of [b]usiness," meaning "consistent with the past custom[s] and

---

[72] *Id.* ¶¶ 49, 51; *see* EPA § 2.7(a).

[73] EPA § 2.7(a)-(b).

[74] *Id.* § 2.7(a); *see also* PTO ¶ 58.

[75] EPA § 2.7(f).

[76] *Id.*

[77] *Id.*

practice[s]" of Unknown Worlds.[78]  Krafton's consent was required for certain matters listed in Schedule II to the EPA, including issuing dividends, incurring debt, changing the corporate structure, or granting intellectual property licenses.[79]

The parties also set the consequences of a Key Employee's departure.  Rather than condition the earnout on continued employment of all Key Employees, the parties priced in a modest financial adjustment.  If Cleveland, McGuire, or Gill left the company during the earnout period, the qualifying revenue would be reduced by $1 million per departing Key Employee.[80]

Alongside these financial contingencies, the EPA defined the grounds for a Key Employee's termination for "Cause."[81]  The definition of Cause was specifically negotiated.[82]  Under the agreement, a Key Employee could be fired for Cause if he engaged in the commission of a felony, the "intentional, wrongful disclosure of trade secrets or confidential information," "a willful act or omission . . . that constitutes gross misconduct," or an "intentional act of fraud or dishonest[y]."[83]

---

[78] *Id.* § 1.1 (defining "ordinary course of business").

[79] *Id.* at Schedule II (listing negative covenants).

[80] EPA § 2.7(a), Ex. B § (1)(f); *see supra* note 392.

[81] EPA § 2.7(f).

[82] *See* Gill Tr. 131-32 (agreeing that the contract he "helped negotiate included a specific definition for what would constitute cause").

[83] EPA § 1.1 (defining "Cause").

15

Separately, Cleveland, McGuire, and Gill each entered into Employment Agreements with Unknown Worlds.[84] They were required to be employed as of closing, after which they were "at will" employees.[85] They agreed to devote "substantially all of [their] business time and efforts" to Unknown Worlds.[86] They also agreed to perform the duties associated with their executive positions and "such additional duties" as Unknown Worlds' Board of Directors (the "Board") might assign.[87] The agreements reinforced that, as officers, the Key Employees owed fiduciary duties to Unknown Worlds.[88]

## I. Post-Closing Roles

After the acquisition closed, Unknown Worlds' multi-game division of labor continued. *Moonbreaker* received the bulk of the Founders' focus, as it had for several years. Cleveland served as the Game Director, leading the design and creative vision, while McGuire acted as the Technical Director, building the game's

---

[84] JXs 256-58 ("Employment Agreements"). The Employment Agreements are governed by California law. *See, e.g.*, JX 256 § 15(a).

[85] *See, e.g.*, *id.* §§ 2, 6(b).

[86] *See, e.g.*, *id.* § 2(b).

[87] *Id.*

[88] *Id.* (listing activities that the employee may engage in as long as he does not "create a potential business or fiduciary conflict").

16

codebase.[89] Neither Founder had a day-to-day role on the *Subnautica* franchise, which continued to run under the leadership of Kalina and the *Below Zero* team.[90]

Cleveland was not entirely divorced from *Subnautica*, however. With Krafton's encouragement, he explored opportunities for a *Subnautica* film or television adaptation.[91] This "transmedia" strategy was a means to broaden the game's audience and increase the IP's value—a goal shared by Unknown Worlds and its new parent company.[92]

While the Founders focused on creative development, Gill ensured the studio ran smoothly. As President, Gill managed the business operations and served as Unknown Worlds' primary liaison with Krafton.[93] He worked closely with Maria Park, Krafton's Head of Corporate Development, who joined the Board.[94] Park was Unknown Worlds' assigned "advocate" within Krafton, acting as a bridge that

---

[89] *See* Cleveland Tr. 699-701; McGuire Tr. 239; JX 1087 at 7.

[90] Gill Tr. 38; Cleveland Tr. 694.

[91] Cleveland Tr. 705; *see* JX 412; *see also* Gill Tr. 20, 50.

[92] *See* Kim Tr. 464-65.

[93] Gill Tr. 32 (discussing how Gill "ended up in a lot of meetings with a lot of different people across [Krafton's] many, many, many departments" after the acquisition because "everyone was excited to talk to this new subsidiary"); Park Tr. 486 (discussing how Gill kept the "communication channel" between Krafton's studio champion and *Subnautica* "to him[self] mostly").

[94] Park Tr. 482, 504.

supplied guidance and secured internal resources.[95] With Park facilitating support, Gill oversaw the integration of Krafton's "menu" of services, including financial budgeting, marketing, and legal functions.[96]

The first year post-closing was defined by collaboration and optimism. Cleveland alternated between devoting time to *Moonbreaker* and coaching the vision of the *Subnautica* team.[97] Krafton was enthusiastic about *Moonbreaker*'s progress and *Subnautica*'s strong revenue generation.[98]

## J.     The *Moonbreaker* Breakdown

The honeymoon was short-lived.

In September 2022, Unknown Worlds released *Moonbreaker* into early access. The game represented a bold attempt to digitize the tabletop experience, featuring a novel painting suite that modeled the precision of creating physical miniatures.[99] But despite positive critical reception for its innovative mechanics, the game failed to find a sustainable audience. Player counts dropped, and revenue fell

---

[95] *Id.* at 485-86, 505-06 (describing her role as the "champion" for Unknown Worlds within Krafton); Gill Tr. 56.

[96] Gill Tr. 31, 67, 83; Park Tr. 487.

[97] Cleveland Tr. 700-01; *see also* Gill Tr. 32 (describing the mood post-acquisition as "very positive" with "a lot of excitement").

[98] JX 1087 at 7 (Park discussing the Founders' hard work in the aftermath of the acquisition); Gill Tr. 24 (discussing ongoing *Subnautica* revenue); *see* Gill Tr. 32.

[99] JX 259.

well below projections.[100] Through September 2023, Cleveland and his team worked around the clock in "emergency mode," to no avail.[101]

For Cleveland, the failure was profound. He had devoted years of long hours and intense creative energy to the project he considered his masterpiece.[102] To see it rejected by the market was a "tough pill to swallow."[103]

Burned out and heartsick, Cleveland admitted to his colleagues at a late 2023 retreat in Italy that he had "hit a wall."[104] When the rest of the team traveled home, Cleveland decided to stay behind for several weeks.[105] He stepped away from the studio's daily operations to focus on his mental health.[106]

This break was not kept from Krafton. Park attended the retreat in Italy and witnessed Cleveland's emotional statement firsthand.[107] So did "Jay," the "Studio Supporter" Krafton assigned to assist the daily functioning of Unknown Worlds.[108]

---

[100] *See* Gill Tr. 35-36; JX 390 (initial post-mortem report).

[101] Cleveland Tr. 701-02.

[102] *Id.*

[103] *Id.* at 702.

[104] *Id.* at 702-04; *see also* Gill Tr. 36.

[105] *See* JX 344.

[106] Cleveland Tr. 704-06; *see also* JX 344 (email discussing extended leave).

[107] Cleveland Tr. 703; Gill Tr. 36-37.

[108] *See* Gill Tr. 36 ("Maria attended, as well as Jay from the Krafton side, our studio champion and our [Studio Supporter].").

After the retreat, Cleveland continued to be transparent with Park about his need for a break.[109]  Park did not object.

## K.      New Roles and Strategic Pivots

Cleveland took an extended leave to recover.[110]  While he was away, Unknown Worlds began early development on *Subnautica 2*, the highly anticipated sequel to its flagship franchise.  Gill ran the studio, while Kalina—who had led *Below Zero*'s creation—spearheaded development of the sequel.[111]  Kalina and his team worked diligently to advance *Subnautica 2* through its early phases.[112]  But without the direct involvement of *Subnautica*'s original creators, the team struggled to find the game's identity.[113]

Cleveland returned from his leave in early 2024 and began to reshape his relationship with Unknown Worlds.  He shared with family and friends that he was

---

[109] Cleveland Tr. 707; *see* Park Tr. 491 (acknowledging that developers need time to recover after failures and that she expected Cleveland would take a break); JX 854 at 7 (Slack message from Park); *see also* Park Dep. 56-57 (discussing Cleveland's burnout); JX 396 at 2 (Cleveland recounting when he "completely burned out in September" to Park).

[110] Cleveland Tr. 704-05.

[111] Gill Tr. 62 (discussing "no change" in his role leading operations and confirming he "manage[d] all the studio operations"); Park Tr. 576 (explaining that Kalina "ended up leading SN2" since Cleveland had been "all-in on *Moonbreaker*"); Gill Tr. 38.

[112] *See* Cleveland Tr. 701-02 (describing his role as "coaching" and being "in the wings on standby").

[113] JX 686 at 5 ("We can't even get [M]ax to look at some code for Sn2 water to help us."); *see* Gill Tr. 180; *see also* McGuire Tr. 268; Cleveland Tr. 778 (testifying the team "felt a bit lost; like, they didn't know exactly what kind of game they were making").

"no longer making video games."[114] He dedicated his limited working hours—about four per week—to leading a *Subnautica* film adaptation.[115] He viewed this not as an abandonment of his job, but a strategic "transmedia" pivot.[116] His hope was that *Subnautica*'s cinematic debut would drive millions of new players to the game and materially increase the franchise's value, much like *The Last of Us* or *Fallout* had reignited enthusiasm through screen media.[117]

At the same time, Cleveland resumed his mentoring of the game development team and saw that they were "a bit lost" on *Subnautica 2*.[118] Cleveland urged Kalina and co-project lead, Anthony Gallegos, to build a "holistic prototype" to find the game's core loop.[119] But he maintained his boundary of not leading game development and respected the team's autonomy.

McGuire underwent a parallel transition during this time. As Unknown Worlds scaled, the Technical Director role required more people management and

---

[114] JX 469 at 1.

[115] Cleveland Tr. 804 (testifying he worked "probably four-hours a week" on the film).

[116] *Id.* at 705 ("I did start basically dreaming of a *Subnautica* film . . . something was being born there."); *id.* at 721 ("I started working on that much more seriously [in the beginning of 2024].").

[117] *Id.* at 730-31 (testifying that films are "huge, huge moments for video games, and they bring an entirely new audience in and they bring a lot of revenue").

[118] *Id.* at 778 (testifying the team "felt a bit lost; like, they didn't know exactly what kind of game they were making").

[119] *Id.* at 713-14 (discussing JX 400 video regarding coaching frustrations and pushing for a holistic prototype); JX 400; *see also* Cleveland Tr. 701.

less coding. McGuire felt that his core strengths—scrappy, hands-on coding and rapid prototyping—were no longer a fit within the more bureaucratic organization.[120] He had become, in his view, "obsolete."[121]

By the spring of 2024, McGuire confided in Gill and Cleveland that he wanted to quit Unknown Worlds.[122] Gill recognized McGuire's value and encouraged him to stay on in a different role that McGuire found meaningful.[123] Gill reminded McGuire that a financial adjustment to the earnout threshold would be made if McGuire were to quit.[124]

Despite their distance from the heart of the studio, Cleveland and McGuire's involvement paid off. In the spring of 2024, McGuire teamed up with Cleveland to build a prototype of *Subnautica 2* to help guide the team.[125] When it became clear that the existing leadership structure was not working, the Key Employees made a change. The studio replaced Kalina and elevated Anthony Gallegos to lead designer.

---

[120] Cleveland Tr. 729-30; McGuire Tr. 242-43, 335-36; JX 476.

[121] McGuire Tr. 292-93; JX 434 (McGuire's personal notes).

[122] McGuire Tr. 244 ("I did tell [Gill] that I wanted to quit."); JX 565 at 109 (McGuire writing in his journal: "I met with Charlie and Ted to let them know I'm quitting."); *id.* at 20, 82.

[123] McGuire Tr. 245 (testifying that Gill "did a great job helping restore my confidence" and "talked about ways that we could resolve that conflict"); *id.* at 290 ("[Gill] convinced me not to leave."); Gill Tr. 45-46.

[124] *See* Gill Tr. 46-48 (testifying they discussed the earnout but noting the adjustment "wasn't something that we thought was a major concern"); *see also id.* at 45-46.

[125] McGuire Tr. 335-36; Cleveland Tr. 728-29; JX 1330 at 3.

"[T]he progress of the game . . . completely took off."[126] This successful course correction set the stage for Cleveland and McGuire to formalize their new roles.

### L. Krafton's Knowledge and Support

Krafton remained apprised of Unknown Worlds' status and the Founders' reduced capacities, including from Gill's regular updates to Park.[127]

As early as February 2024, Krafton learned that Cleveland would not be working directly on *Subnautica 2*. Notes of a meeting between Park, Gill, and Jay (the assigned Studio Supporter) state that though "[s]ome people in [Krafton] HQ [were] expecting C[leveland] to be working on *Subnautica 2*," Park was to "manage expectations" at Krafton.[128] It was mutually understood that Cleveland would "not be working directly on the game as he would like to empower the current team."[129]

By July 2024, months of discussions culminated with Gill formalizing planned title changes for the leadership team with Park.[130]

Cleveland would become the "Franchise Creative Director" with a "focus . . . on *Subnautica*, exploring TV and film opportunities."[131] When Park suggested her

---

[126] Cleveland Tr. 720.

[127] Gill Tr. 67-68; Park Tr. 493, 522; *see also id.* at 486, 488.

[128] JX 394 at 3; *see* Gill Tr. 42-44.

[129] JX 394 at 3.

[130] JX 471 (Slack message from Gill to Park); PTO ¶ 76.

[131] JX 478 at 1 (emphasis added); *see* Gill Tr. 64.

and Kim's expectation that Cleveland would "have a stronger focus on creatives and IP," Gill corrected her.[132] He clarified that Cleveland "wasn't doing anything on the studio operations side, at all . . . (and ha[d]n't for a long time)."[133]

McGuire would become the "Special Projects Director."[134] As Gill told Park, McGuire would "stop managing people and focus purely on tech and R&D."[135] McGuire's main interest was exploring how *Subnautica* benefited neurodivergent players and children with autism.[136]

Gill would transition from President to CEO. This change would accommodate Krafton's corporate structure, which required a studio CEO to handle budgeting and high-level administrative approvals.[137] Gill's purview, however, would not change.[138]

Park understood the realignment, writing: "I guess within the studio there [is] not really much change" but "title changes that more clearly represent the actual

---

[132] JX 471 at 2.

[133] *Id.* (Gill writing: "[W]hile he's attended meetings . . . he doesn't do any of the work or contribute to operational tasks.").

[134] McGuire Tr. 247; JX 478 (email announcing Special Projects Director role).

[135] JX 471 at 3.

[136] JX 476 (notes on how McGuire wants to "[r]esearch how games could actually be adding to the world" and noting that he received "lot of emails from parents of kids on the autism spectrum" who had benefitted from the game); *see also* JX 591 at 4.

[137] Gill Tr. 53-54, 64-65; JX 478.

[138] Gill Tr. 62 (discussing "no change" in his role leading operations and confirming he "manage[d] all the studio operations").

roles" of Cleveland and McGuire.[139] She later gave Gill an update that Krafton had "no concerns about announcing the [role] changes before [Unknown Worlds'] August retreat."[140] That consent included Kim, whom Park had updated.[141] Kim was reminded of the title changes in a meeting several weeks later and did not object.[142]

Krafton also learned that Cleveland and McGuire each voluntarily reduced their salaries from nearly $400,000 to $100,000 to reflect their reduced operational roles. Gill entered these salary changes directly into Krafton's centralized human resources system, which gave Krafton visibility into the adjustment.[143] Krafton's finance team, including its Head of Global Finance, reviewed and processed the payroll updates.[144] The reduction was included in internal Krafton spreadsheets circulated among its executives.[145]

Krafton was overall supportive of the Founders' revised roles—particularly of Cleveland's cinematic focus. Expanding the *Subnautica* IP into other media had

---

[139] JX 471 at 2; *see also* Gill Tr. 67; Park Tr. 532-35; JX 508A (showing Park understood Cleveland's role would not include *Subnautica 2*).

[140] JX 471 at 3.

[141] *Id.* at 2-3; PTO ¶ 76.

[142] JX 584; JX 585A; Oliveira Tr. 368-71.

[143] JX 803A; Yoon Tr. 644-45; Gill Tr. 70-71, 159.

[144] Gill Tr. 68-70; JX 490; JX 495.

[145] JX 803A (staffing tab, rows 20, 55); Yoon Tr. 623-24 (discussing JX 827, where he asks Park about the salary reduction seen in the data); JX 827.

been a shared strategic pillar since the acquisition.[146] A *Subnautica* movie was viewed by Krafton as a low-cost, high-reward way to elevate the brand globally and increase game sales.[147]

To build his Hollywood network, Cleveland also dabbled in other film ideas, including a Christmas movie and a zombie script.[148] He was open about these efforts both with Krafton and publicly. For example, in November 2024, he emailed Park that he was making a Christmas movie, and in February 2025, she received a link to a podcast documenting his filmmaking journey.[149] Krafton leadership accepted these efforts. Park said that Krafton "d[id]n't intend to hinder [Cleveland's] Hollywood development" because film experience could serve as a "stepping stone" to a successful *Subnautica* movie.[150] She even relayed that Krafton's Chairman had suggested they "officially recogniz[e]" Cleveland's film project.[151]

---

[146] *See* Park Tr. 482; Cleveland Tr. 721-22; Kim Tr. 393.

[147] *See* Park Tr. 539-40; Kim Tr. 464-65; Cleveland Tr. 722-23 ("She [Sujin Lee] was excited about the *Subnautica* film. . . . [Krafton was] totally on board.").

[148] Cleveland Tr. 735-36.

[149] JX 561 (Nov. 2024 email); JX 605 (Feb. 2025 Slack message with podcast link); *see also* JX 1331 (WhatsApp messages about the zombie movie).

[150] JX 1245A (translation) 45 (Feb. 27, 2025 message between Park and Kim, agreeing that the Christmas movie seems to be "a beneficial experience for the company. . ., so we don't intend to hinder his Hollywood involvement"); JX 605 at 2 (Feb. 9, 2025 Slack from Park to Oliveira: "this experience could become a stepping stone"); *see also* Park Tr. 539-40 (agreeing the Christmas movie could be a "stepping stone" to a successful *Subnautica* film).

[151] JX 1245A (translation) 45 (Feb. 2025 message between Park and Kim).

McGuire's shift, though less outward facing than Cleveland's, was also disclosed to Krafton. In December 2024, Thiago Oliveira—the new Studio Supporter assigned by Krafton to Unknown Worlds—included Park on an email titled "CSR Initiatives," which "[d]iscuss[ed] ways Krafton can support Max's new projects" on social impact.[152] Park also received correspondence linking McGuire's work to Krafton's corporate social responsibility goals.[153]

## M. *Subnautica 2*

As Cleveland and McGuire's new roles took shape, the *Subnautica 2* team hit its stride under Gill's leadership and Gallegos's creative vision. The game underwent an "incredible transformation" that made up for the project's slow development timeline.[154] In May 2025, Cleveland play-tested the latest build. His reaction, captured on video, was unbridled enthusiasm.[155] The team had taken the vision he shared upon his return to Unknown Worlds and expanded upon it autonomously.

---

[152] *See* JX 591 (email from Oliveira to Park about "Krafton x UW Collaborating on CSR Initiatives"); Park Tr. 560; Yoon Tr. 607.

[153] Park Tr. 503, 558-61.

[154] Gill Tr. 72 (testifying that under Gallegos, it was an "incredible transformation" and the "velocity picked up immediately").

[155] JX 740 (playtest video); Cleveland Tr. 811-12, 842-43.

The game was shaping up to be "amazing," and the studio prepared for a launch.[156]  Consistent with Unknown Worlds' "secret sauce" of early access development, the team targeted August 2025 for the initial release.[157]  It knew the game was not "finished"—early access games never are—but it contained the core loop, content, and polish required for the community to experience it and provide needed feedback.

In April, Krafton greenlit a trailer announcing that the game would launch in early access "later in 2025."[158]  A "developer video blog" posted online featured Gallegos telling fans that they would soon be invited "on a futuristic underwater survival adventure, set in an all-new mysterious alien world."[159]  Gallegos also announced that "[f]or the first time," fans would have "the chance to experience *Subnautica 2* with [their] friends in a co-op" rather than only solo play.[160]  He encouraged fans to "tell [the team] exactly what [they] think" about the game's "new vehicles, craftables, biomes, and leviathans."[161]

---

[156] Cleveland Tr. 745 (testifying that the game demo "looked totally amazing").

[157] Gill Tr. 21-22 (discussing Unknown Worlds' "secret sauce"); *id.* at 75 ("We had narrowed it to August at that time . . . August 14 of 2025.").

[158] *See id.* at 77; JX 1093.

[159] JX 1093; *see* Gill Tr. 74-78.

[160] JX 1093.

[161] *Id.*

The team was excited, the game was playable, and the release date was set.[162] The gaming community's response was highly enthusiastic. Millions of people expressed their interest in buying *Subnautica 2* on Steam, the "largest PC store for [Unknown Worlds'] games."[163]

Krafton's enthusiasm soon evaporated.

### N.    The Milestone Review

In May 2025, the parties scheduled a milestone review meeting. For Unknown Worlds, this was an opportunity to coordinate with Krafton on marketing and publishing logistics for the upcoming launch.[164] Krafton's finance team ran earnout projections to prepare for the meeting.[165] Their models predicted that a successful August 2025 early access launch of *Subnautica 2*, with "over 1.67 million copies sold by Q4 2025," would generate significant revenue and "trigger [the] earnout."[166] A "Financial Planning Base" case scenario indicated a $191.8 million

---

[162] Gill Tr. 72-73 (testifying that the game was "coming together fantastically well" and that playtest feedback was increasingly positive); *id.* at 103 ("[W]e're going to go ahead and announce the date publicly.").

[163] *Id.* at 105-06.

[164] *Id.* at 84-85.

[165] JX 1199A at 1.

[166] JX 690A at 1; JX 1199A at 1.

total earnout payment, and a best-case scenario indicated a $242.2 million payment.[167]

These figures immediately captured the attention of CEO Kim.[168] Kim, who had personally led the acquisition of Unknown Worlds, felt that Krafton had overpaid.[169] He feared that making an earnout payment would earn him a reputation as a "pushover."[170]

At a May 20, 2025 meeting, Kim told Cleveland that paying the earnout "could significantly reduce the studio's book value."[171] Kim said that this reduction was "something he, as [the] person who was in charge of the investment, would have to be accountable for."[172] When Kim asked if there was "a need to rush the release," Cleveland held firm that "delaying the project increases risk" and that "it's better to launch early, get user feedback, and improve from there."[173]

---

[167] JX 1199A at 2; *see* JX 690A (email regarding "Earn-out Scenario Analysis").

[168] Kim Tr. 478 (confirming he saw the forecast).

[169] *Id.* at 406-07, 435; *see also* Kim Dep. 39, 52.

[170] JX 1192A at 2 ("Everyone admits the contract was a bad deal, but the problem is that we keep being the fool even afterward. It's not about the money—it just feels awful to be taken advantage of. For a registered director, being a 'pushover' would even amount to breach of fiduciary duty.").

[171] JX 730A at 2 (Krafton's Young Kim's contemporaneous notes summarizing the meeting for Park); Kim Tr. 431 (confirming he said the earnout would "significantly reduce the studio's book value").

[172] JX 730A at 2; *see* Cleveland Tr. 744.

[173] JX730A at 2.

A week later, the planned milestone review meeting went forward. Gallegos showed Krafton executives the latest game build, which showed great progress.[174] Gill and Cleveland advocated for support for the planned August 14 release.[175] But some Krafton executives claimed the game was "not ready" for release, citing a lack of "freshness" and "volume."[176] Krafton's Oliveira told a colleague he was "starting to think . . . that people are trying to create excuses to not pay the earn outs."[177]

## O.  Krafton Scrambles

By the end of May, Kim had looped in Park and Krafton's Legal Department to discuss the earnout. Kim was focused on the amounts that each of Cleveland, McGuire, and Gill stood to make, which he viewed as "greed."[178] He complained that the EPA was a "bad deal" and felt "taken advantage of."[179] Park cautioned him, though, that she "d[id]n't think the current [*Subnautica 2*] build [wa]s in such bad

---

[174] JX 1179 (May 27, 2025 milestone review presentation); Park Tr. 512-13; JX 1193 at 2 (Krafton's creative director: "[B]ased solely on the build and the development situation, I think it is better to proceed with the EA [early access] within this year in line with the Development Team's opinion.").

[175] Gill Tr. 86-87.

[176] Kim Tr. 397 (claiming game lacked content); Gill Tr. 86 ("Instead of it being a meeting about publishing and making the game successful, it became them making—them being our colleagues at Krafton, Inc.—sharing reasons why they believe the game should be delayed and pushed out."); JX 2015 (Milestone Review Recommendation).

[177] JX 742.

[178] JX 765A at 2 ("Human greed really has no limit.").

[179] *Id.* (Kim to Park: "bad deal," "taken advantage of").

shape," which could create a "debatable" issue in "potential litigation."[180]  She also noted that "apart from C[leveland] personally," who had "become negligent since *Moonbreaker*," she "would say that [Unknown Worlds] hasn't been so poorly managed as to deliberately deceive the parent company."[181]

Kim remained focused on the "cost Krafton has to pay with the enterprise value [it was] actually gaining."[182]  Krafton's analysis showed an "Enterprise Value" of approximately $93.5 million compared to a projected $191.8 million earnout.[183]  Kim began to explore options, including firing the Key Employees.

On June 2, Park warned Kim over Slack that a "dismissal with cause" would not eliminate the earnout obligation, while exposing Krafton to "lawsuit and reputation risk."[184]  And so Kim turned to ChatGPT for help.[185]  When the AI chatbot responded that the earnout would be "difficult to cancel," Kim complained to Park

---

[180] *Id.* at 2-3.

[181] *Id.* at 2.

[182] *Id.* at 3 (capitalization omitted).

[183] JX 771 at 150; *see* Park Tr. 552-53.

[184] JX 1188 at 1 (Slack message from Park to Kim: "Hi CEO . . . it seems to be highly likely that the earn-out will still be paid if the sales goal is achieved regardless of the dismissal with cause.  Therefore, there isn't much that we can practically gain other than punishment with a simple dismissal alone, whereas I am worried that we may be exposed to lawsuit and reputation risk . . ."); *see also* JX 778; JX 778A.

[185] Kim Tr. 440-41.  Kim admitted at trial that he had deleted specific, relevant ChatGPT logs.  *Id.* at 441.  This particular chat was deleted.  *Id.*

that the EPA was "a contract under which we can only be dragged around."[186]  He expressed frustration that Unknown Worlds had the "authority to determine the release date and determine publishing" without Krafton's involvement.[187]  Kim asked Park to reach out to the Legal Department and to call him.  Moments later, Park sent Kim the section of the EPA discussing the Key Employees' "operational control" over Unknown Worlds for so long as "any Key Employee is employed by the Company."[188]

## P.    Project X

At ChatGPT's suggestion, Kim formed an internal task force, dubbed "Project X."[189]  The task force's mandate was to either negotiate a "deal" on the earnout or execute a "Take Over" of Unknown Worlds.[190]  They looked to buy time.

On June 4, Richard Yoon—Krafton's Head of Strategy and Operations— circulated a "plan" outlining "[n]ext steps" after having a discussion with Kim.[191]  He directed that Krafton's messaging, including to Gill, be that Krafton was "in the

---

[186] JX 1188 at 3 (Slack message from Kim to Park: "Now, chatgpt starts to answer that it is difficult to cancel the earn-out."); Kim Tr. 440-41.

[187] JX 1188 at 3.

[188] *Id.* at 4 (pasting in language from the EPA).

[189] Kim Tr. 449 (confirming "Project X" name); Yoon Tr. 651; JX 820A at 3.

[190] JX 917A (Project X update email regarding "Take Over" strategy).

[191] JX 934A at 20; Park Tr. 508.

33

process of internal alignment."[192] He also shared a draft announcement that Krafton would make to Unknown Worlds' fans, suggesting that *Subnautica 2* would be delayed and that Cleveland and McGuire had been uninvolved with the game.[193]

By June 5, Krafton continued to put Gill off. Gill grew concerned, writing to Kim that he would appreciate Kim's "recommendation as soon as possible."[194] Gill explained that Krafton had become non-responsive "with launch planning," leaving Unknown Worlds with "zero progress on many key initiatives."[195] He received no response.

Meanwhile, Kim sought ChatGPT's counsel on how to proceed if Krafton failed to reach a deal with Unknown Worlds on the earnout. The AI chatbot prepared a "Response Strategy to a 'No-Deal' Scenario," which Kim shared with Yoon.[196] The strategy included a "pressure and leverage package" and an "implementation roadmap by scenario."[197] It also suggested a "key summary of responses" Krafton could deliver to the Key Employees:

---

[192] JX 934A at 20.

[193] *Id.* at 21.

[194] JX 1189A at 4.

[195] *Id.*

[196] *Id.* at 2; *see* Kim Tr. 444.

[197] JX 1189A at 2 (capitalization omitted).

Key Summary of Responses

> a. **Preemptive Framing** - Repeat that protecting quality and fan trust is the highest priority, undermine the 'Large Corporation VS. Indie' framing
>
> b. **Securing Control Points** -
>
> > \* Lock down Steam/console publishing rights and access rights over code/build pipeline through both legal and technical aspects.
> >
> > \* For the earn-out freeze, keep room for negotiations through provision stating "immediate removal if specific development results are achieved"
>
> a. **Systematic materials for legal defense** - Prepare contract interpretation memorandums, log all communications, seek external consultation
>
> b. Team retention - Operation of retention packages for key personnel and rapid backfill pipelines in anticipation of resignation/departure scenarios
>
> c. Two handed strategy - Create a structure that allows for both hardball (Legal+ Finance) and softball (Support/Incentives) approaches so moderate factions within Unknown Worlds can push for compromise.[198]

Over the next month, Krafton followed most of ChatGPT's recommendations.

First, Krafton pursued "preemptive framing" by taking the fight directly to Unknown Worlds' fans.[199] On June 12, Krafton posted a message on the Unknown Worlds and *Subnautica* websites. It stated: "To our 12 million fellow Subnauts . . . . We have asked the series' creators—Charlie Cleveland and Max McGuire—to once

---

[198] *Id.* (emphasis added).

[199] JX 934A at 13-14 (Kim writing that the goal of the message was to "secure public support from fans and legal validation of our legitimacy" and suggesting that ChatGPT draft the message).

again helm the journey" to *Subnautica 2*.[200] It also stated (falsely) that "Charlie and Max [we]re considering [Krafton's] invitation."[201] Gill and the Unknown Worlds team were shocked, since they had "nothing to do with" the message, which Krafton had posted "overnight."[202]

Second, Krafton "secur[ed] control points." As ChatGPT recommended, Krafton locked down Steam publishing rights to ensure Unknown Worlds could not publish *Subnautica 2*.[203] This severed Unknown Worlds' practical ability to launch *Subnautica 2*. Gill repeatedly asked Krafton to return control of the Steam platform to Unknown Worlds.[204] Krafton ignored him, except for Oliveira, who told Gill (via a LinkedIn message): "[Kim] has no intention of transferring stuff back to you guys (like the Steam app)."[205]

Third, Krafton prepared "systematic materials for legal defense." Its Legal Department wrote "contract negotiation memorandums," including what they referred to as the "Legal Letter," sent to the Founders on June 10.[206] The letter made

---

[200] JX 1039.

[201] *Id.*

[202] Gill Tr. 98-99.

[203] *Id.* at 105-06.

[204] *Id.* at 106.

[205] *Id.* at 110, 113; JX 1309.

[206] Yoon Tr. 654-55; JX 840 (the "Legal Letter"); JX 1202A (June 8 Slack messages between Kim and Yoon about sending "the legal letter" to the Founders); JX 934A at 12 (Krafton legal circulating a draft of the "legal letter" on June 6).

three demands: (1) that Cleveland and McGuire's titles revert to Game Director and Technical Director; (2) that Cleveland and McGuire "rededicate themselves to leading the development of [*Subnautica 2*]"; and (3) that Gill and the Board "enable the implementation" of those steps.[207] Krafton also began to gather "supporting materials" showing Cleveland's film forays and social media posts.[208]

Krafton's seizure of Steam and other systems forced Gill to the negotiating table, and they began to discuss a solution.[209] This included having the Key Employees transition out of Unknown Worlds and settle "on the earnout to some amount."[210] When the negotiations stalled, Yoon told Kim on June 27: "It might actually be easier to just do a takeover."[211] Kim responded: "Set a date."[212]

## Q. The Terminations

On July 1, 2025, Krafton sent termination letters to Cleveland, McGuire, and Gill, removing them from their positions effective July 31.[213] The letters identified a single ground for dismissal: the "intention to proceed with a premature release of

---

[207] JX 840 at 3.

[208] JX 843A; JX 1202A (Slack messages regarding "systematic materials for legal defense"); Gill Tr. 91 (testifying about logging communications).

[209] Gill Tr. 212, 226-27; *id.* at 108.

[210] *Id.* at 109-10; Park Tr. 518-519, 521-25.

[211] JX 1190A (Slack between Yoon and Kim).

[212] *Id.*

[213] JXs 954-56; JX 959.

*Subnautica 2*."[214]  Krafton asserted that releasing the game in August would "inflict long-term damage on the reputation of the game and franchise."[215]

That same day, Krafton removed the Key Employees from Unknown Worlds' Board and replaced them with three Krafton representatives (in addition to Park).[216] The new Board resolved "that *Subnautica 2* shall not be released for early access absent further review and the affirmative vote of a majority of the Board."[217]

To replace Gill as CEO, Krafton appointed Steve Papoutsis.[218]  Papoutsis was already the CEO of another Krafton subsidiary, and would run Unknown Worlds part-time.[219]  Before his appointment, he had neither played an Unknown Worlds game nor overseen the development of an early access title.[220]

## R.    The Data Downloads

The Key Employees were not surprised by their terminations.  After watching Krafton starve the studio of its publishing resources and lock them out of the Steam publishing platform, they expected that Krafton would take this drastic step.  In

---

[214] JXs 954-56 (emphasis added).

[215] *Id.*

[216] JX 961.

[217] *Id.* at 2 (emphasis added).

[218] Yoon Tr. 658-59; JX 961 at 2.

[219] *See* Papoutsis Dep. 36-40; Yoon Tr. 658-60.

[220] JX 945; Yoon Tr. 660; Papoutsis Dep. 55, 72.

anticipation of further escalation, they initiated large-scale data downloads of Unknown Worlds' company files and data.

Gill began his downloads in early June, exporting his company email account, documents from Unknown Worlds' Google Drive, and Slack messages.[221] Late-night download activity on June 2 caused an automated security alert to Unknown Worlds' Operations Manager, Stephanie Ramirez.[222] The next morning, Ramirez told Gill that she "[s]aw the Google alert that [he] kicked off a data export" and wanted to confirm "it was [Gill]."[223] Gill responded that he was "just backing a few things up."[224]

McGuire also executed massive data exports. On June 27, he downloaded 99,902 files from his Unknown Worlds Google Drive and the company's shared drive folders.[225] His downloads included *Moonbreaker* and *Subnautica*-related documents and directories.[226] McGuire downloaded these files to a second hard drive on his home computer.[227]

---

[221] Gill Tr. 115 (testifying he downloaded his company email, Google Drive files, and Slack messages).

[222] *Id.* at 116-17; JX 786.

[223] JX 786 at 2; *see* Gill Tr. 204-05.

[224] JX 786 at 2; Gill Tr. 205.

[225] McGuire Tr. 257 (confirming downloads of emails, legal documents, and Google Drive folders); *id.* at 332; PTO ¶ 106.

[226] McGuire Tr. 329-30.

[227] *Id.* at 258.

Cleveland downloaded 72,140 files from the studio's servers, enlisting McGuire's technical assistance to help him archive the materials.[228]  Cleveland's downloads included legacy game files and proprietary source code.[229]  Additionally, on July 2—the day after he received his termination notice—Cleveland accessed the studio's collaboration platform to export files, including a *Subnautica 2* "Prototype Design" board.[230]  Cleveland also deleted several personal files.[231]

Yoon testified that "by June 27, 2025," Krafton had discovered the Key Employees were downloading data to personal devices.[232]  After the July 1 terminations, Krafton's IT and legal teams learned the full extent of the Key Employees' downloads.[233]  Other than the personal files deleted by Cleveland, the Key Employees subsequently returned all of the downloaded files to Krafton upon its request.[234]

---

[228] Cleveland Tr. 824-25 (confirming he sent McGuire a video instructing him on what to download); JX 1043 ¶ 17(b).

[229] Cleveland Tr. 825-27.

[230] *Id.* at 831-32; JX 1046.

[231] Cleveland Tr. 749, 832.  Cleveland also testified that he deleted board game prototypes. At post-trial argument, Fortis's counsel represented that Cleveland returned the prototype files.  *See* Tr. of Jan. 9, 2026 Post-trial Oral Arg. ("Post-trial Arg. Tr.") 146.

[232] Yoon Tr. 616 ("[B]y June 27 . . . . we also found out that some of the assets and data w[ere] being downloaded personally to their computers.").

[233] *Id.* at 625.

[234] Gill Tr. 118; McGuire Tr. 258; Cleveland Tr. 749-51.

## S.    Litigation Ensues

On July 10, 2025, Fortis Advisors, LLC, as the representative of the former stockholders of Unknown Worlds, filed this action against Krafton.[235] The complaint alleges three counts, including breach of contract to obtain damages for violations of the EPA, breach of contract to obtain specific performance of the EPA, and breach of the implied covenant of good faith and fair dealing.[236] Fortis moved to expedite the suit, which I granted in part.[237] I expedited only the portion of the claim for specific performance concerning the propriety of the Key Employees' terminations and loss of operational control.[238] I reasoned that the deprivation of control over a unique asset presented a threat of irreparable harm.[239] This decision effectively bifurcated the proceeding into two phases: the present expedited phase concerning specific performance and operational control ("Phase One") and a later phase concerning the earnout and money damages ("Phase Two").

On August 4, 2025, Krafton answered the complaint, stating that "[d]ue to the unprepared release of *Subnautica 2*, Krafton . . . was left with no choice but to

---

[235] Verified Compl. (Dkt. 1) ("Compl.").

[236] Compl. ¶¶ 168-86.

[237] Dkt. 29.

[238] Tr. of July 18, 2025 Hr'g on Pl.'s Mot. to Expedite (Dkt. 36) 35-37.

[239] *Id.* at 36.

terminate" the Key Employees.[240] During discovery motions practice, Krafton began to assert that the Key Employees were terminated due to their role changes and downloads of confidential information.[241]

The parties filed pre-trial briefs on November 6.[242] A three-day trial was held from November 17 to 19. After post-trial briefing was complete, oral argument was presented on January 9, 2026.[243]

## II.    ANALYSIS

In Phase One of this litigation, Fortis tried its breach of contract claim seeking specific performance to restore the Key Employees to their positions at and operational control of Unknown Worlds. To prevail on this claim, Fortis must prove the existence of a contract, the breach of an obligation imposed by that contract, and resultant damage.[244] It bears the burden of proving these elements by a preponderance of the evidence.[245] Krafton, in turn, bears the burden of proving by

---

[240] Def.'s Answer to Verified Compl. (Dkt. 39) ("Answer") ¶ 91.

[241] Tr. of Sept. 12, 2025 Hr'g on Cross-Mots. to Compel (Dkt. 81) ("Cross-Mots. Hr'g Tr.") 10, 23, 68-69.

[242] *See* Fortis's Pre-trial Br. (Dkt. 122) ("Pl.'s Pre-trial Br."); Krafton's Pre-trial Br. (Dkt. 121) ("Def.'s Pre-trial Br.").

[243] *See* Fortis's Post-trial Br. (Dkt. 149) ("Pl.'s Post-trial Opening Br."); Krafton's Post-trial Br. (Dkt. 154) ("Def.'s Post-trial Br."); Fortis's Post-trial Reply Br. (Dkt. 156) ("Pl.'s Post-trial Reply Br.").

[244] *See Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009).

[245] *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *9 (Del. Ch. Oct. 30, 2015) ("Proof by a preponderance of the evidence means proof that something is more likely than not."); *In re Coverdale*, 1987 WL 758002, at *3 (Del. Ch. Aug. 3, 1987)

a preponderance of the evidence that its terminations were for Cause or that it was otherwise justified in assuming operational control.

I find in Fortis's favor. The Key Employees were not terminated for Cause as defined in the EPA and thus retained operational control of Unknown Worlds. None of Krafton's proffered justifications have merit. To remedy Krafton's breaches, I grant a tailored specific performance remedy outlined in Section III below.[246]

## A.    Whether the Founders Were Terminated for Cause

A central inquiry in Phase One is whether Krafton's termination of the Key Employees breached the EPA. The EPA sets strict parameters around Krafton's ability to remove the Key Employees. Krafton's right to terminate them hinges on whether it had "Cause" to do so.

The EPA defines "Cause" as:

> (i) ***an intentional act of fraud or dishonest[y] in connection with his or her duties, or in the course of his or her employment with the Company***, (ii) his or her conviction of a felony or a plea of "guilty" or "no contest" to a felony; (iii) a willful act or omission by such individual that constitutes gross misconduct and that is injurious to the Company, or (iv) his or her intentional, wrongful disclosure of trade secrets or confidential information of the Company; provided that no act or omission shall be considered "willful" unless committed without good faith and

("The burden of proof in civil cases in Delaware is typically one of preponderance of the evidence . . . ." (citation omitted)).

[246] *See infra* Section III.

without a reasonable belief that the act or omission was in the Company's best interest.[247]

The parties agree that only the first definition is at issue. Krafton does not argue that the Key Employees' actions constituted "gross misconduct" or a "wrongful disclosure of trade secrets."[248] Nor does Krafton address whether the Key Employees committed fraud.[249] Accordingly, I focus my analysis on whether the Key Employees engaged in an "intentional act of . . . dishonesty."[250]

### 1.    The Meaning of "Cause"

An agreement's express terms provide the starting point in a contract dispute. "Delaware [law] adheres to the 'objective' theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party."[251] When interpreting a contract, the court must ascertain the

---

[247] EPA § 1.1 (defining "Cause"); *see id.* at Preamble (defining "Company" as Unknown Worlds).  The definition contains a typo: "dishonesty" is written as "dishonestly."  I use the correct term "dishonesty" in this decision when citing to the definition of Cause.

[248] At post-trial argument, I asked whether Krafton's allegations might implicate other portions of the definition—namely, "a willful act or omission by such individual that constitutes gross misconduct and that is injurious to the Company."  Post-trial Arg. Tr. 19-20.  Counsel for both parties argued that this clause invokes a more severe sort of misconduct not at issue here, particularly given the proviso defining "willful."  *Id.* at 20, 106-07.

[249] *Id.* at 106-07 (explaining that subsection (i) requires "actual fraud or intentional dishonesty," then describing the Key Employees' acts suggesting the latter); Def.'s Pre-trial Br. 41-50 (arguing that the Key Employees engaged in various intentional acts of dishonesty).

[250] EPA § 1.1.

[251] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

parties' intent based on the four corners of the agreement.[252] Absent ambiguity, Delaware courts will not distort contract language under the guise of construing it.[253] To that end, the court "will give each provision and term effect" to avoid rendering any part of the contract mere surplusage.[254] For terms not defined in a contract, the court "look[s] to dictionaries for assistance in determining the[ir] plain meaning."[255]

The phrase at issue is an "intentional act of . . . dishonesty."[256] The concept of "dishonesty" generally involves a lack of honesty, a disposition to defraud or deceive, or the telling of a falsehood to cause the other party to rely on the resulting misimpression.[257] For the modifier "intentional" to have independent meaning, it must elevate the required level of intent above that demanded by "dishonesty"

---

[252] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014).

[253] *See Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012); *City Investing Co. Liq. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993) ("If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent.").

[254] *Osborn*, 991 A.2d at 1159 (citing *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 397 (Del. 2010)).

[255] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[256] *See supra* note 247 and accompanying text.

[257] *See Dishonesty*, Merriam-Webster, https://www.merriam-webster.com/dictionary/dishonesty (last visited Mar. 1, 2026) (defining "dishonesty" as "lack of honesty or integrity: disposition to defraud or deceive"); *see also Dishonesty*, Black's Law Dictionary (12th ed. 2024) (defining "dishonesty" as "[d]eceitfulness as a character trait; behavior that deceives or cheats people; untruthfulness; untrustworthiness"); *In re Lyle*, 74 A.3d 654, 2013 WL 4543284, at *7 (Del. Aug. 23, 2013) (TABLE) (stating that "dishonesty[] . . . requires a 'conscious objective or purpose to accomplish'" a given act); *Matter of Beauregard*, 189 A.3d 1236, 1247 (Del. 2018) (explaining that the term "dishonesty . . . impl[ies] a state of mind requirement").

alone.[258]  "Intentional" is commonly defined as an act "[d]one with the aim of carrying out the act."[259]

Accordingly, an "intentional act of dishonesty" requires more than an inaccurate statement or an objectively unauthorized action.  To establish Cause, Krafton must prove that a Key Employee acted with the conscious objective to deceive it.  This interpretation aligns with the Cause definition's structure, which lists fraud, felonies, gross misconduct, and wrongful disclosure of trade secrets— each involving serious culpable conduct.[260]  Reading "dishonesty" to encompass inaccuracies or unauthorized acts would expand Cause beyond the narrow grounds the parties negotiated.[261]

---

[258] *Osborn*, 991 A.2d at 1159 (outlining the rule against surplusage).  If the EPA had used "dishonesty" alone, that could embrace conduct short of "intentional dishonesty."  *See, e.g.*, *Nat'l Newark & Essex Bank v. Am. Ins.*, 385 A.2d 1216, 1222 (N.J. 1978) (holding that "dishonest" on its own has a "broad scope," including "breach of trust" or even "manifestly unfair" acts).  Because the parties chose to include the term "intentional" to modify "dishonesty," I cannot read the term "intentional" out of the contract.

[259] *See Intentional*, Black's Law Dictionary (12th ed. 2024) (also defining "intentional" as "performed or brought about purposely by someone who is aware").

[260] EPA § 1.1.

[261] *See PJT Hldgs., LLC v. Costanzo*, 339 A.3d 1231, 1248 (Del. Ch. 2025) (explaining that when a contract uses established legal terminology like "fraud," courts presume the parties intended its common-law meaning, which requires an "intentional perversion of truth for the purpose of inducing another in reliance upon it" (quoting *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 n.16 (Del. 1993))).

Krafton advocates for a broader reading. It contends that "intentional" does not require an intent to *deceive*.[262] In Krafton's view, Cause exists if the act is deliberate, regardless of the actor's subjective purpose.[263]

Krafton's interpretation is unsupported. The cases Krafton relies upon—*Wyant v. State* and *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*—are inapposite. *Wyant* addressed statutory criminal intent, which is irrelevant to a negotiated term in a commercial contract.[264] *Hexion* is equally unhelpful. There, the court construed the phrase "knowing and intentional breach" and held that a party need only take a deliberate act that results in a breach, regardless of the actor's intent.[265] A breach of contract, however, can occur without any intent to do so. Dishonesty cannot. Because dishonesty inherently requires a deceptive state of mind, an "intentional act of dishonesty" means that the deception itself must be the actor's specific aim.[266] I next consider whether the Key Employees engaged in such an act.

---

[262] *See* Def.'s Post-trial Br. 50 (citing *Wyant v. State*, 519 A.2d 649 (Del. 1986), and *Hexion Specialty Chems., Inc. v. Huntsman Corp*., 965 A.2d 715 (Del. Ch. 2008)).

[263] *Id.*

[264] *Wyant*, 519 A.2d at 659.

[265] *Hexion*, 965 A.2d at 746-48.

[266] *See Pacific Ins. v. Higgins*, 1992 WL 212601, at *5 & n.3 (Del. Ch. Sept. 2, 1992) (providing that, in other contexts, "it has been held that subjective intent is an element of 'dishonesty'" and finding that, "if subjective intent [is] essential for a finding of 'dishonesty' it [was] undeniably present" (collecting cases)); *see also Stargatt v. Avenell*, 434 F. Supp. 234, 243 (D. Del. 1977) (construing "dishonest" in a contract as implying the

2. Failure to Prove "Intentional Dishonesty"

Krafton advances two rationales for the terminations: (1) that the Key Employees "engaged in intentional acts of dishonesty to keep Krafton in the dark about Cleveland and McGuire's abandonment of their roles"; and (2) the Key Employees' downloads of confidential Unknown Worlds information.[267]

Neither constitutes an intentional act of dishonesty. The role changes were transparent maneuvers rather than deliberate acts of deception. The data downloads were protective measures, lacking the requisite intent to deceive.

a. The Role and Salary Changes

Krafton submits that, after *Moonbreaker*'s commercial failure, the Founders effectively abandoned their game development roles at Unknown Worlds.[268] Cleveland stopped making games, reducing his involvement with the studio to four hours per week on filmmaking.[269] McGuire similarly withdrew from his technical duties to focus on social responsibility initiatives.[270] Though Gill continued to run

---

deliberate telling of a falsehood with the intention that the other party rely on the resulting misimpression).

[267] *See* Def.'s Pre-trial Br. 40 (focusing on role abandonment and data downloads); *see also* JX 1073 (Krafton's Resps. and Obj. to Pl.'s First Set of Interrogs.) 4, 14, 23-24. Krafton's justifications at trial were a departure from the original basis it listed for termination, which was game readiness. *See* JXs 954-56 (termination notices).

[268] Def.'s Post-trial Br. 11-13.

[269] *Id.* at 42-43; *see also* Cleveland Tr. 804.

[270] Def.'s Post-trial Br. 12-13, 16-17; *see also* JX 476 at 2.

the business, Krafton accuses him of covering for Cleveland and McGuire to preserve operational control and protect the earnout.[271] In Krafton's view, this collective abandonment of responsibilities and concealment of the Founders' functional retirements amounted to "intentional act[s] of dishonesty" under the EPA.[272]

This theory fails because the Founders transparently communicated their transition away from their original roles publicly, internally, and directly to Krafton's senior personnel. Krafton's contemporaneous knowledge and consent foreclose any finding of deceit.

Krafton concedes that it "knew that the Founders' titles changed in 2024."[273] But it insists it "did not know that those title changes masked diminishing roles and responsibilities for Cleveland and McGuire."[274] Not so. Krafton learned about the limited scope of their roles, including on the *Subnautica* franchise, long before the terminations.

Krafton admitted in its answer to Fortis's complaint that "Cleveland had abandoned video games to pursue filmmaking, a process he documented publicly on

---

[271] Def.'s Post-trial Br. 15-18.

[272] *Id.* at 44, 50.

[273] *Id.* at 50.

[274] *Id.*

his website and social media."[275]  Indeed, Cleveland was open with the world about his pivot from video games to filmmaking.[276]  Some of these public statements, such as podcasts, were sent directly to Park and Kim.[277]

Krafton was kept directly apprised of these changes.  As early as February 2024, Gill told Park that Cleveland "w[ould] not be working directly on [*Subnautica 2*]," and Park was "to manage expectations" with Krafton.[278]  Park then told Kim that Cleveland had been "focusing heavily on film projects lately," and Kim said Krafton's Chairman had "suggested officially recognizing Charlie's film project, considering it could provide valuable experience to [Krafton]."[279]  She also told Kim that Charlie was "personally funding a Christmas movie," which might be a "beneficial experience for the company," and that Krafton did not "intend to hinder his Hollywood involvement."[280]  In March 2025, Park expressed similar excitement

---

[275] Answer 3-4.

[276] *See* JX 566 (Abyssal website); JX 570 (podcast); JX 573 (podcast); JX 844 (Instagram); JX 845 (LinkedIn); JX 846 (X post).

[277] *See* JX 602A; JX 605; JX 1331 at 2-3.

[278] JX 394 at 3; *see also* JX 508A at 6 (Oliveira telling Park in August 2024 he was not "overly concerned even if Charlie takes a break for now and only continues his roles in media and as a *Subnautica* IP advisor" (emphasis added)).

[279] JX 1245 at 17-18, 45.

[280] JX 1245A at 45; *see also* JX 561 (Cleveland telling Park in November 2024 that things were "moving slowly but surely with the *Subnautica* film" and that he had "another film project on the side—a Christmas movie that's a spiritual sequel to *Elf*" (emphasis added)); *see* Park Tr. 464-66, 538-40.

about Cleveland's other projects, saying the "zombie movie [he was] writing" had "potential to be a great film," or even "a game."[281] Cleveland discussed his other film projects at length with Kim.[282]

McGuire's shift was far less public. But it, too, was known to Krafton. Krafton highlights as deceitful a July 2024 Slack message where Gill told Park that McGuire would step down from management to "focus purely on tech and R&D."[283] Whatever Gill's initial framing, the record shows Krafton understood McGuire had transitioned toward social impact work. In December 2024, for example, Oliveira emailed a group including Gill and Park about collaborating "on social responsibility initiatives."[284] The meeting would address "ways Krafton can support Max's new projects . . . studying the impact of our games on individuals and society, as well as exploring how games can be leveraged to address social challenges and issues."[285]

As for Gill, no coverup was executed. Krafton points to his July 2024 Slack message to Park that "nothing is changing" as providing false assurances.[286] Read in context, Gill was simply explaining how the new titles formalized a transition that

---

[281] JX 1331 at 2.

[282] JX 730A; Cleveland Tr. 743-44.

[283] JX 471 at 3.

[284] JX 591 at 4.

[285] *Id.*

[286] Def.'s Post-trial Br. 50-53.

had happened months prior. He clarified that "Charlie wasn't doing anything on the studio operations side, at all."[287] Park understood, replying that there was "not really much change . . . but simply about the title changes that more clearly represent the actual roles."[288] Gill then communicated the "responsibility changes" to Krafton and Unknown Worlds.[289] He informed Krafton's finance department of the title changes, and updated Unknown Worlds' internal human resource systems—to which Krafton had full access—to reflect the Founders' reduced salaries.[290] Krafton's internal communications showed its understanding that "Ted reduced Max and Charlie's compensation to 100k from 384k" by early June 2025.[291]

Cleveland and McGuire abdicated the game development duties they held when Krafton acquired Unknown Worlds. But they were not dishonest about it. Whether Cleveland or McGuire violated an unwritten expectation by working fewer hours as at-will employees is not before me. Because the Founders were forthcoming about their shifts away from game making to reduced roles and salaries,

---

[287] JX 471; *see* Gill Tr. 57.

[288] JX 471; Park Tr. 498.

[289] JX 478 at 1 (explaining McGuire was "Special Projects Director, working on initiatives that fall outside [the studio's] main development activities" and Cleveland was "Franchise Creative Director," with a "focus on *Subnautica*, exploring TV and film opportunities" (emphasis added)); *see* JX 496 at 4.

[290] Gill Tr. 170-71; *id.* at 70-71 (testifying salary changes were tracked in the HR system accessed by Krafton); *see* JX 490 at 1; JX 803A (Unknown Worlds HR spreadsheet).

[291] JX 827; *see also* Yoon Tr. 623-24 (acknowledging that Yoon learned of the Key Employees' salary reductions by early June 2025).

there was no deception, no coverup, and no intent to mislead. The role changes do not constitute Cause.

### b. The Data Downloads

Krafton's second justification centers on the Key Employees' actions shortly before their discharge. In late June 2025, as relations with Krafton rapidly deteriorated, the Key Employees downloaded large volumes of Unknown Worlds' data to personal devices.[292] The files included source code, legacy game files, and internal communications.[293] Krafton claims that these unauthorized extractions of confidential information constituted terminable offenses.[294]

Krafton did not meet its burden on this defense. Although the data downloads were wrongful, they were a response to an escalating corporate emergency. The Key Employees lacked the conscious objective to deceive required for a for-Cause termination.

Fortis attempts to justify the conduct by arguing that the Key Employees had an "absolute right"—as senior executives and Board members—to access and retain this corporate data under Unknown Worlds' bylaws and the EPA.[295] This argument

---

[292] *See supra* Section I.R.

[293] *See supra* Section I.R.

[294] Def.'s Post-trial Br. 56-58.

[295] *See* JX 1185 (Bylaws) § 8.5 (giving the Key Employees an "absolute right" to copy Unknown Worlds documents); EPA § 10.3; *see also* Pl.'s Post-trial Opening Br. 47; Pl.'s Post-trial Reply Br. 28-30.

is unpersuasive. The Key Employees were not seeking to inspect books and records or gather information in the ordinary course of their duties. They executed a bulk extraction to protect the data itself.

This mass download of corporate data was wrong. Yet general notions of wrongfulness or IT policy violations cannot substitute for the language of the EPA. Krafton agreed to limit its termination rights to an "intentional act of . . . dishonesty."[296] As previously established, intentional dishonesty requires a specific aim to deceive.[297]

Krafton did not prove that the downloads meet this high bar. The Key Employees' actions were misguided, but driven by a good faith, defensive motive. By late June 2025, Krafton had commandeered the Unknown Worlds website and the Steam platform to block the release of *Subnautica 2*, and was threatening a broader takeover.[298] The Key Employees genuinely and reasonably feared that they were about to be locked out of the studio's systems. Gill credibly testified that the Key Employees downloaded the data to guard "Unknown Worlds, Inc., in protecting

---

[296] EPA § 1.1. I cannot "circumvent the for-cause contractual predicate for which [the Key Employees] bargained" for in the EPA by justifying termination "for any reason unearthed after the fact." *A&J Cap., Inc. v. L. Off. of Krug*, 2019 WL 367176, at *11 n.128 (Del. Ch. Jan. 29, 2019), *aff'd*, 222 A.3d 143 (Del. 2019) (TABLE).

[297] *See supra* notes 257, 266 (explaining the meaning of "dishonest"); *supra* Section II.A.1; *see also* Def.'s Post-trial Br. 50 (citing *Hexion*, 965 A.2d at 746-48).

[298] *See supra* notes 199-208; *see also* Gill Tr. 105-06, 109-113; McGuire Tr. 257-258.

the company and the team."[299]  Cleveland echoed that they needed to "defend the company" from a hostile parent.[300]

Critically, the Key Employees did not loot the company to enrich themselves, steal data to form a competing venture, or sell secrets to a rival.[301]  They kept the materials confidential and returned them promptly after their terminations.[302]  These are not the actions of thieves.[303]

---

[299] Gill Tr. 115.  To the extent Krafton argues this "protection" was nefarious because it included potentially self-publishing the game, that argument is not compelling.  At a June 12, 2025 meeting, Kim admitted that self-publishing was "completely up to" the Key Employees.  JX 860 at 27.  Preserving a right one believes in good faith to have is not intentional dishonesty.

[300] Cleveland Tr. 748.

[301] See Def.'s Post-trial Br. 49 (citing *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 879 (Del. Ch. 2022)).  *Metro Storage* is distinguishable.  The defendant there was terminated for cause after disclosing confidential information to a client-competitor before ultimately joining that competitor.  *Metro Storage*, 275 A.3d at 823, 879.  Krafton attempts to argue that the Key Employees misappropriated information to start a new company.  But the "plans to '[s]tart a new company'" Krafton misleadingly references are the musings of an outsider.  Def.'s Post-trial Br. 44; JX 1057 at 2; *see* Cleveland Tr. 756-58, 833-34 (testifying that the suggestion to "[s]tart a new company" in his notes were "what [his friend] said, not what [Cleveland] said").  There is no evidence the Key Employees considered doing so, and they made clear they had no such plans.  *See* Cleveland Tr. 833-34, 838; Gill Tr. 118; McGuire Tr. 257-58.

[302] Gill Tr. 117-18; McGuire Tr. 258; Cleveland Tr. 749-51.  Krafton asserts that Cleveland wrongfully deleted a "Prototype Design" file on July 2.  Def.'s Post-trial Br. 33.  But Fortis clarified at post-trial argument that any company files that were taken were ultimately returned.  Post-trial Arg. Tr. 147; *see also* Cleveland Tr. 749.

[303] See Def.'s Post-trial Br. 57 (arguing that "theft is inherently an act of dishonesty" (citing *Manna v. State*, 945 A.2d 1149, 1153 (Del. 2008))).

Krafton asserts that the conduct was deceitful because Gill made an evasive statement to an IT administrator, claiming he was just "backing a few things up."[304] Although this statement was incomplete—Gill had downloaded tens of thousands of files—it does not transform a protective download into a terminable act of intentional deceit under the EPA.[305] Krafton lacked independent Cause to terminate the Key Employees for these acts.

### 3. Post-Termination Justifications

Krafton's sole justification in its July 1, 2025 termination notices was the Key Employees' "intention to proceed with a premature release of *Subnautica 2*," which purportedly violated "obligations under Section 2(b) of the Employment Agreement."[306] It repeated that basis in its answer to Fortis's complaint.[307] During

---

[304] Gill Tr. 115-17; JX 786.

[305] *See* JX 1043 (stipulating McGuire downloaded 99,902 files and Cleveland downloaded 72,140 files); McGuire Tr. 257.

[306] JXs 954-56 (termination notices) (asserting that the game "is not ready for release and will inflict long-term damage on the reputation of the game and franchise," and citing alleged violations of "obligations under Section 2(b) of the Employment Agreement"). They do not say which of the many clauses in Section 2(b) were violated. *See* Employment Agreements § 2(b). In any event, a violation of Section 2(b) does not amount to Cause under the EPA. *See infra* note 375 and accompanying text.

[307] Answer ¶ 91 ("As leaving the Key Employees in charge could bring irreversible damage to Unknown Worlds and Krafton due to the unprepared release of *Subnautica 2*, Krafton, who had been working with Unknown Worlds in good faith until the last possible moment, was left with no choice but to terminate the employment of these three Key Employees."); *see also* Def.'s Opp'n to Pl.'s Mot. to Expedite (Dkt. 6) ¶¶ 3-5, 14-19.

56

the litigation, however, Krafton walked that back and pivoted to the two *post hoc* reasons analyzed above.[308]

Even if Krafton's newly proffered grounds met the contractual definition of Cause, Krafton's reliance on them would fail under the mend-the-hold and after-acquired evidence doctrines. Delaware courts employ these doctrines to guard against pretextual maneuvering by employers. They address related but temporally distinct problems. The mend-the-hold doctrine limits a party's ability to shift the contractual justification for its conduct during litigation; the after-acquired evidence doctrine addresses whether misconduct discovered after a termination can retroactively justify the termination.[309]

If the employer knew of the ground *before* the firing but did not rely on it during the termination, it is waived under the mend-the-hold doctrine.[310] This doctrine precludes a party from asserting new reasons in litigation once its original

---

[308] *See supra* Section II.A.2; *see also* Cross-Mots. Hr'g Tr. 24-25 (Krafton's counsel asserting that "game readiness is not relevant to phase one of this case" because it has "nothing to do with termination or operational control"). Although it still believes "*Subnautica 2* was not ready for release," it is not pressing game readiness as a basis for termination. Def.'s Post-trial Br. 47 n.22.

[309] *See PJT Hldgs.*, 339 A.3d at 1260 (distinguishing between justifications known before termination and those discovered after).

[310] *See id.* at 1260 (explaining that the mend-the-hold doctrine "bars a party who rejects a contract on certain specified grounds from changing position after litigation is filed when those grounds for rejection do not pan out" (citation omitted)).

ones fail, preventing the use of seriatim justifications.[311] Applied here, the mend-the-hold doctrine bars Krafton from relying on conduct it was aware of before July 1 to justify the terminations.

For grounds discovered only *after* a termination, the employer must satisfy the stringent requirements of the after-acquired evidence doctrine.[312] As the United States Supreme Court explained in *McKennon v. Nashville Banner Publishing Co.*, an employer relying on after-acquired evidence must prove the later-discovered conduct was "of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge."[313] Under this doctrine, any misconduct Krafton discovered after July 1 must independently establish Cause to justify the terminations.

---

[311] *Id.* at 1260-61 (noting that if a "terminating party knew about the justification before the termination and did not rely on it, then the party presumptively waived reliance on that justification by not citing it at the time of termination"); *Harbor Ins. v. Cont'l Bank Corp.*, 922 F.2d 357, 362 (7th Cir. 1990) (describing mend-the-hold as a "common law doctrine that limits the right of a party to a contract suit to change his litigating position"); *Liberty Prop. Ltd. P'ship v. 25 Mass. Ave. Prop. LLC*, 2008 WL 1746974, at *14 (Del. Ch. Apr. 7, 2008) (same), *aff'd*, 970 A.2d 258 (Del. 2009).

[312] *See McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 362-63 (1995) ("Where an employer seeks to rely upon after-acquired evidence of wrongdoing, *it must first* establish that the wrongdoing . . . ." (emphasis added)); *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 759 (9th Cir. 1996) (noting that the burden of proof rests on the employer).

[313] 513 U.S. at 362-63; *see also Metro Storage*, 275 A.3d at 879 (applying the *McKennon* framework); *Davenport Gp. MG, L.P. v. Strategic Inv. P'rs, Inc.*, 685 A.2d 715, 723 (Del. Ch. 1996) (same). Allowing the use of after-acquired evidence under these conditions comports with the understanding that "it is not bad faith to change one's position

These doctrinal filters are consistent with the skeptical view courts take of post-termination rationalizations.[314] That skepticism is especially warranted where, as here, an employer abandons its contemporaneous ground for termination and advances different ones mid-litigation.[315] Working from hindsight, an employer has a "strong incentive not only to discover previously undisclosed wrongdoing on the part of the plaintiff, but also to conclude that that conduct would in fact have resulted in the plaintiff's immediate discharge."[316]

The doctrines support rejecting Krafton's shifting defenses. The role change justification is waived under the mend-the-hold doctrine, and the data downloads fail to independently establish Cause as required by the after-acquired evidence doctrine.

### a. Waiver of the Role Change Justification

The after-acquired evidence doctrine permits Krafton to rely on the role changes if it "learned about [them] after the termination."[317] Krafton cannot satisfy

---

on the basis of information that could not have been acquired earlier." *Harbor Ins.*, 922 F.2d at 364.

[314] *Cf. PJT Hldgs.*, 339 A.3d at 1261; *O'Day*, 79 F.3d at 759 (applying the *McKennon* standard in the employment discrimination context and noting the need for courts to view employer assertions with skepticism).

[315] *See PJT Hldgs.*, 339 A.3d at 1261 n.153 (explaining that when a party "hokes up a phony defense" and then tries on another for size, they "can properly be said to be acting in bad faith" (citing *Harbor Ins.*, 922 F.2d at 363)).

[316] *O'Day*, 79 F.3d at 762.

[317] *PJT Hldgs.*, 339 A.3d at 1260; *see also McKennon*, 513 U.S. at 362 ("Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of

that foundational requirement. As discussed above, it was fully aware of the Founders' reduced roles, salaries, and titles changes by at least May and June of 2025—weeks before issuing the July 1 termination notices.[318] The after-acquired evidence doctrine therefore cannot be used to revive the justification.[319]

Instead, the mend-the-hold doctrine applies.[320] Krafton chose to rely exclusively on game readiness in its termination notices despite its awareness of the role changes. Now, it cannot resurrect those changes to manufacture Cause in this litigation.[321]

Regardless, Krafton's argument fails on the merits. To succeed, Krafton must prove that the role and salary reductions "independently support[ed] termination."[322]

---

discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit.").

[318] *See* JX 1073 at 26 (Krafton interrogatory responses admitting it "discovered" these grounds in "May and June 2025"); Kim Tr. 404 (testifying Cleveland told him in May he was "no longer involved in *Subnautica* at all"); *see also supra* Section II.A.2.a.

[319] *See supra* notes 310-311 and accompanying text; *PJT Hldgs.*, 339 A.3d at 1260 ("Reliance on after-acquired evidence is most persuasive when the terminated party concealed the evidence."); *see also Tatum v. Fairstead Affordable LLC*, 2023 WL 8923400, at *4 (Del. Ch. Dec. 22, 2023) (noting that the after-acquired evidence doctrine does not "authorize an employer to learn about misconduct, make a business decision not to act on it . . . then reverse course months later").

[320] *See supra* note 310 and accompanying text; *PJT Hldgs.*, 339 A.3d at 1260.

[321] *PJT Hldgs.*, 339 A.3d at 1260-61.

[322] *Id.* at 1260.

60

The EPA requires Krafton to do so by showing the changes constituted "intentional act[s] of . . . dishonesty."[323] As analyzed above, Krafton failed to meet that burden.[324]

### b. Failure of the Download Justification

Krafton discovered the data downloads after the July 1 terminations, placing it within the after-acquired evidence doctrine.[325] But Krafton's defense still fails. It has not proven that the data downloads constitute an independent basis for termination.

Fortis states that the after-acquired evidence doctrine is inapplicable because Krafton knew about the downloads before July 1.[326] This argument relies on the testimony of Richard Yoon, Krafton's Head of Strategy and Operations, who initially stated that Krafton personnel knew of the transfers by June 27.[327] Yoon later clarified

---

[323] *See supra* Section II.A.1 (explaining the meaning of "intentional act of dishonesty"). To prove an independent basis for termination, an employer must show the later-discovered conduct satisfies the specific standards in the parties' agreement. *See Metro Storage*, 275 A.3d at 879, 881 (holding that the plaintiffs "argue persuasively that if they had known about [the defendant's] outside consulting, then they would have terminated him for cause" because his conduct violated an employment agreement); *see also A&J Cap.*, 2019 WL 367176, at *11 n.128 ("[W]hile Krug could supplement his for-cause basis for removal with additional evidence or causes for termination discovered after removal, he still was obliged to demonstrate that A & J had engaged in conduct . . . at the time of removal that would satisfy the standards for removal as laid out in the operative agreements.").

[324] *See supra* Section II.A.2.a.

[325] *See supra* note 312 and accompanying text.

[326] Pl.'s Post-trial Opening Br. 44.

[327] Yoon Tr. 616.

that Krafton only learned of the downloads in July, once its IT team accessed Unknown Worlds' systems.[328]

I find Yoon's corrected timeline credible. Krafton did not grasp the fact—much less the scope—of the downloads until a post-termination forensic IT audit.[329] Though an Unknown Worlds IT administrator detected unusual network activity by Gill in early June, her knowledge—as a mid-tier employee of a subsidiary—is not imputed to Krafton.[330] Krafton's officers remained in the dark.

Because the after-acquired evidence doctrine applies, Krafton must show that the data downloads would have resulted in the Key Employees' discharge.[331] This burden is two-fold. Krafton must first establish that the downloads supported termination for Cause under the EPA.[332] It must then prove that the conduct would in fact have resulted in termination.[333]

---

[328] *Id.* at 625 (explaining that Krafton learned later because Unknown Worlds' systems were kept separate).

[329] Def.'s Post-trial Br. 33, 49.

[330] *See* 3 *Fletcher Cyclopedia of the Law of Corporations* § 807 (Sept. 2025 Update) (noting that while "[a] corporation will be deemed to have received notice of facts within the knowledge of officers responsible for informing the corporation of facts affecting its interests," the "[k]nowledge of a mere employee of the corporation ordinarily is not imputed to the company").

[331] *See McKennon*, 513 U.S. at 362-63; *see supra* Section II.A.2 (explaining the requirements of the after-acquired evidence doctrine).

[332] EPA § 1.1; *see supra* Section II.A.1.

[333] *O'Day*, 79 F.3d at 759.

Krafton has done neither. As found above, the Key Employees' actions were protective measures, not intentional dishonesty.[334] And even if the contractual standard for Cause were met, Krafton failed to prove that it would have fired the Key Employees over the downloads. The shifting, litigation-driven testimony of Krafton's executives at trial belies this narrative.

Krafton's true focus in June 2025 was avoiding its financial exposure. It knew *Subnautica 2* was poised to achieve a $250 million earnout, which Kim viewed as a catastrophic failure.[335] Krafton undertook "Project X" to either force a deal on the earnout or execute a "takeover" of the studio.[336] Terminating the Founders was one tactic explored and ultimately chosen by Krafton to accomplish its goal.

In early June, Park warned Kim that:

> [I]t seems to be highly likely that the earn-out will still be paid if the sales goal is achieved regardless of the dismissal with cause. Therefore, there isn't too much we can practically gain other than

---

[334] *See supra* Section II.A.2.b.

[335] *E.g.*, JX 730A at 2 (Krafton notes of a May 21, 2025 meeting where Kim "noted that because of the earn-out and incentive scheme, granting them now could significantly reduce the studio's book value—something he, as the person who was in charge of the investment, would have to be accountable for . . . [h]e questioned whether there's even a need to rush the release"); JX 765A at 2-3 (Kim on June 1, 2025: "Everyone admits the contract was a bad deal, but the problem is that we keep being the fool even afterward. . . . When I said the company's value was too low compared to what we paid, if Charlie had shown even a hint of remorse, I wouldn't feel this way. But he's just too selfish."); JX 771 at '6378 (Park confirming that the earnout would exceed Unknown World's enterprise value to Krafton).

[336] *See* Kim Tr. 448-50; JX 917A; JX 934A; *see* JX 1189A at 2-3 (Kim's ChatGPT-designed "Response Strategy to 'No-Deal' Scenario").

punishment with a simple dismissal alone, whereas I am worried that we may be exposed to lawsuit and reputation risk.[337]

Kim responded with deep frustration, lamenting "this is a contract under which we can only be dragged around."[338] Given this maneuvering, Krafton's witnesses lacked credibility when insisting they would have fired the leaders of a $500 million acquisition solely over a data backup and an evasive statement to IT.

When an employer faces a contractual payout it wishes to avoid, it is heavily "incent[ivized] to go rummaging through the employee's history to find any reason it can to announce that the termination was really for cause."[339] That is precisely what happened here. Frustrated by the Key Employees' refusal to forfeit operational control and facing a nine-figure liability, Krafton went searching for a pretext.

This court of equity will not permit a party to use the after-acquired evidence doctrine to fabricate Cause where the evidence shows the termination decision was made for different reasons. The doctrine prevents a wrongdoer from profiting from concealed misconduct. It does not grant an employer license to retroactively invent grounds for termination.

---

[337] JX 1188 at 2.

[338] *Id.* at 3 (Kim to Park: "Now, chatgpt starts to answer that it difficult to cancel the earn-out. . . . If so, this is a contract under which we can only be dragged around.").

[339] *Cf. Robinson v. Kelly Cable of N.M., LLC*, 2025 WL 3516162, at *5 (Del. Ch. Dec. 8, 2025) (declining to apply the after-acquired evidence doctrine where the employer attempted to use it to avoid severance obligations years after a without-cause termination).

## B. Whether the Founders Lost the Right to Operational Control

The next issue is whether Krafton validly seized operational control of Unknown Worlds.[340]

The EPA provides that, "so long as *any* Key Employee is employed by the Company," the Key Employees are entitled to "maintain operational control" of Unknown Worlds "in all material respects, including (for both existing and new products) product roadmap, launch, planning, partnering, budgeting and employee matters[.]"[341]  Because the Key Employees were not terminated for Cause, they retained the right to control the studio's operations unless Krafton had other grounds to strip them of it.

The Key Employees' operational control right is limited by three express conditions.  They must:

> (A) operate [the] businesses *only in the ordinary course of business* and use commercially reasonable efforts to preserve the goodwill and organization of [the] business and the relationships with its users, distributors, publishers, suppliers, employees, independent contractors, and other business relations;
>
> (B) *not take any action set forth on Schedule II* [to the EPA] without the prior consent of [Krafton] . . .[; and]

---

[340] *See* PTO ¶¶ 116, 120.

[341] EPA § 2.7(f) (emphasis added).

(C) maintain such operational control only to the extent it is ***reasonably exercised in good faith*** and in material compliance with applicable Law.[342]

Krafton asserts that the Key Employees violated the ordinary course covenant, certain Schedule II restrictions, and the good faith obligation. If Krafton cannot prove that the Key Employees breached any of these conditions, then its seizure of operational control breached the EPA.

### 1. The Ordinary Course Covenant

The EPA mandated that the Key Employees operate Unknown Worlds "in the ordinary course of business," defined as the "usual and ordinary course of such Person's business consistent with past custom and practice."[343] In this context, the "Person" whose operations are being measured is Unknown Worlds.[344] To retain operational control, the Key Employees were required to conduct Unknown Worlds' affairs in a manner "consistent" with the studio's operations "before and after

---

[342] *Id.*

[343] *Id.* §§ 1.1, 2.7(f).

[344] "Person" means "any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, other entity or governmental entity (whether non-U.S., federal, state, county, city or otherwise and including any instrumentality, division, agency or department thereof)." *Id.* § 1.1.

entering into the [EPA]."[345]  Delaware courts look to the target company's historical operations to assess its compliance with such a covenant.[346]

Krafton interprets this provision as requiring the Founders to continue leading the development of Unknown Worlds' games, regardless of their formal titles.[347]  It invokes the unique vision the Founders brought to the studio, with Cleveland designing each major video game release and McGuire handling technical development.[348]  Without this "magical pair" at the helm of every project, Krafton believes Unknown Worlds could not operate "consistent with past custom and practice."[349]

But an ordinary course covenant is assessed at the company level, not the individual employee level.[350]  Nothing in the EPA required that Cleveland and McGuire maintain the jobs they held when the acquisition closed.[351]  The authority relied on by Krafton underscores this distinction.

---

[345] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *71 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

[346] *See id.* at *75-76.

[347] Def.'s Post-trial Br. 39.

[348] *See supra* Section I.B; Cleveland Tr. 762-63; McGuire 233-34; JX 2001 at 35-36.

[349] Def.'s Post-trial Br. 41 ("The Founders were not 'working at a Burger King'; they built and ran a game studio centered around 'creative vision' and technical implementation." (citing JX 1076 at 110; Cleveland Tr. 692)).

[350] Pl.'s Post-trial Opening Br. 12.

[351] *See supra* notes 388-389.

In *Level 4 Yoga, LLC v. Corepower Yoga, LLC*, a franchisee was found to have maintained the ordinary course during the COVID-19 pandemic, despite having furloughed most of its employees and closed its studios.[352] That was so because the franchisee adhered to its longstanding practice of following the franchisor's directions. The company's past practice was assessed at a level of generality well above operational specifics, and no violation was found despite "extraordinary" disruption in the franchisee's business.[353]

*AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, another busted deal case, addressed both buyer approval rights and an ordinary course covenant.[354] The breach in *AB Stable* involved a systemic shutdown of the company's core, revenue-generating operations. It did not turn on the daily schedules of individual executives.

Finally, in *Ivize of Milwaukee, LLC v. Compex Litigation Support, LLC*, the court held that an ordinary course covenant was breached by the seller's failure to prevent a manager from dismantling the business.[355] The manager planned a competing business, solicited key sales personnel, diverted business, and stole or

---

[352] 2022 WL 601862, at *23-25 (Del. Ch. Mar. 1, 2022), *aff'd*, 287 A.3d 226 (Del. 2022) (TABLE).

[353] *Id.* at *25.

[354] 2020 WL 7024929, at *75-78.

[355] 2009 WL 1111179, at *9 (Del. Ch. Apr. 27, 2009).

destroyed records and equipment.[356] The court emphasized that the "normal and ordinary routine of conducting business does not include destroying business assets and planning to transfer the essence of the business to a competitor."[357]

Unknown Worlds historically functioned under a philosophy the Founders called the "Unknown Worlds way."[358] As pitched to Krafton, this business model relied on a flat, remote organizational structure and a "community-focused" approach to game development.[359] Rather than waiting years to release a finished product, Unknown Worlds launched games in early access to gather player feedback and iterate alongside its community.[360]

The studio's past custom included the Founders delegating primary development duties. When Unknown Worlds developed its most recent entry in the franchise, *Subnautica: Below Zero*, Cleveland and McGuire did not lead the

---

[356] *Id.*

[357] *Id.*

[358] McGuire Tr. 237 (describing the "Unknown Worlds' way" as an "emphasis on iterative development, early access, a focus on the community, being open with them, and making bold and daring games").

[359] Gill Tr. 8-9 (discussing the pitch presentation highlighting the studio as "community-focused, early access-driven" and "fully remote"); *id.* at 21-22 (discussing the "remote working model" and "Simple & Flat Organization Structure"); JX 1095 (pitch presentation).

[360] *See* Gill Tr. 12-13 (explaining early access and community-based game development); McGuire Tr. 237.

69

project.[361] They entrusted leadership to another developer while they focused on *Moonbreaker*, acting only in a limited advisory capacity.[362]

After the acquisition, the studio's operations followed this same playbook. The company maintained its remote, flat structure.[363] It released *Moonbreaker* into early access in September 2022 and utilized community feedback to iterate on the design.[364] When it came to *Subnautica 2*, the team—autonomously from the Founders—prepared for an August 2025 early access release to engage the community, just as the studio had done for *Below Zero*.[365] By the spring of 2025, *Subnautica 2* was on track for launch, with Krafton personnel acknowledging that "the game is coming along well" and its "build quality . . . improved dramatically."[366]

---

[361] Cleveland Tr. 693-94 ("I didn't design anything on *Below Zero*. I didn't do any programming on it. I didn't work on *Below Zero* at all."); McGuire Tr. 236 ("I was never part of the core team . . . . I was not the lead on *Below Zero* . . . .").

[362] Cleveland Tr. 694; McGuire Tr. 236; Gill Tr. 43 ("[Cleveland] hadn't worked on *Subnautica: Below Zero* directly. And we had this incredible team we built, purpose-built for making *Subnautica 2*.").

[363] *See* Gill Tr. 36 ("[W]e're fully distributed and we all work remotely.").

[364] Cleveland Tr. 701 ("We had released *Moonbreaker* into early access after five years at the end of September '22."); McGuire Tr. 241.

[365] Gill Tr. 75 (testifying they had settled on "the final date of August 14 of 2025"); *id.* at 78 ("[W]e were planning an early access release of *Subnautica 2* . . . and we wanted to do it with the community at the center of it. We wanted them playing the game, sharing their feedback[.]").

[366] Park Tr. 569; JX 784A at 2; *see also* JX 984 at 1 (Unknown Worlds' development director confirming that the studio had an "amazing game that is ready to launch").

Krafton's secondary argument—that the late-June data downloads violated the ordinary course covenant—fares no better. Its attempt to analogize the downloads to the misconduct in *Ivize* falls flat.[367] In *Ivize*, employees engaged in a systemic effort to destroy customer records and loot the company to launch a competing venture.[368] Here, the Key Employees executed a bulk download defensively to protect records during a mounting corporate crisis.[369] This isolated incident does not amount to a failure to operate in the ordinary course.

Krafton cannot assemble a breach by conflating individual job duties with company-wide operations. That the Founders changed their titles and worked fewer hours, and the Key Employees downloaded large quantities of company data, does not mean Unknown Worlds departed from its ordinary course. The studio continued to design, develop, and prepare to publish games using its established business model. Thus, Krafton has not shown a deviation from past custom and practice under EPA Section 2.7(f)(i)(A).

---

[367] *See* Def.'s Post-trial Br. 43-44.

[368] *Ivize*, 2009 WL 1111179, at *9.

[369] As discussed above, there is no credible evidence in the record that the Key Employees planned to launch a competing venture. *See supra* note 301.

71

## 2. The Section II Restrictions

Krafton next argues that the Key Employees breached two restrictions in Schedule II of the EPA, giving it the right to assume operational control.[370] It has not proved a breach of either restriction.

### a. Constructive Termination and Good Reason

Schedule II(vi) bars the Key Employees from taking "any action that is reasonably likely to give rise to a claim of constructive termination/dismissal or a claim to resign for 'good reason' . . . as to a Key Employee" without Krafton's consent.[371] Krafton maintains that the Founders' voluntary role and salary changes violated this provision because they met the definition of "Good Reason" in the Founders' own Employment Agreements.[372] It posits that these voluntary changes created conditions for a "Good Reason" resignation, thereby breaching the EPA and forfeiting operational control.[373]

This argument involves considering the EPA alongside the Employment Agreements. Contemporaneously executed contracts that are part of the same transaction may be read together to understand the parties' overall intent.[374] But

---

[370] Def.'s Post-trial Br. 36-37; Post-trial Arg. Tr. 86.

[371] EPA Schedule II(vi).

[372] Def.'s Post-trial Br. 37.

[373] *Id.*

[374] *See Comerica Bank v. Glob. Payments Direct, Inc.*, 2014 WL 3567610, at *7 (Del. Ch. July 21, 2014) (describing the "rule that contemporaneous contracts between the same

Krafton pushes this principle too far, conflating the distinct purposes of the agreements.[375]

The Employment Agreements' "Good Reason" provision protects the employee from unilateral, adverse changes to his employment status.[376] It creates a right to resign and collect severance.[377] A "claim" for "constructive termination" or "good reason" as outlined in Schedule II, by contrast, refers to actions by an employer that are tantamount to firing an employee.[378] That is, Schedule II(vi)

---

parties concerning the same subject matter should be read together as one contract"); *see also* Restatement (Second) of Contracts § 202(2) (A.L.I. 1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").

[375] *See Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *4 (Del. Ch. Jan. 28, 2015) (noting that concluding a purchase agreement and an employment agreement should be read together "begins, not ends, the analysis" because "by their very nature, the restrictions . . . in the purchase agreement and the employment agreement are different" (quoting *Fillpoint, LLC v. Maas*, 208 Cal. App. 4th 1170, 1182-83 (2012))); *cf. RWI Acq. LLC v. Todd*, 2012 WL 1955279, at *7 n.51 (Del. Ch. May 30, 2012) (observing that "[a]lthough[] 'in construing the legal obligations created by [a] document, it is appropriate for the court to consider . . . the language of contracts among the same parties executed or amended as of the same date that deal with related matters' . . . this principle of contractual interpretation 'does not mean that the provisions of one instrument are imported bodily into another, contrary to the intent of the parties'" (first quoting *Crown Books Corp. v. Bookstop, Inc.*, 1990 WL 26166, at *1 (Del. Ch. Feb. 28, 1990); and then quoting 11 *Williston on Contracts* § 30:26 (4th ed., rev. vol. 2011))).

[376] Employment Agreements §§ 6(c), 7(b); *see also* Pl.'s Post-trial Reply Br. 12 (arguing that the "Good Reason" provision protects the Key Employees and cannot be used defensively by Krafton).

[377] Employment Agreements §§ 6(c), 7(b).

[378] *Eastburn v. Del. Dep't of Transp.*, 2009 WL 3290809, at *5 & n.7 (Del. Super. Sept. 21, 2009) (stating that "[c]onstructive termination refers to a resignation under intolerable work circumstances"); *Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 832 (Del. 2005) (noting that to "establish a constructive discharge, the plaintiff was required to show 'working conditions so intolerable that a reasonable person would have felt

prevents the Key Employees, as managers, from taking hostile actions against each other that would lead to a lawsuit or resignation with benefits.

Krafton's attempt to apply this restriction to the Founders' own voluntary role changes is commercially unreasonable.[379] The Founders did not—and could not—create a constructive termination claim against themselves by voluntarily reducing their own salaries or modifying their own duties. Because the Founders never asserted such claims and remained employed, their conduct did not implicate Schedule II(vi).

### b. Hiring New Executives

Krafton also argues that when the Founders stepped back, they created a leadership void and had to replace themselves.[380] It believes that this process involved the hiring and replacement of "executive-level" employees, which required Krafton's consent under Schedule II(vii).[381] Since consent was neither sought nor given, Krafton asserts that the Key Employees breached Schedule II, permitting Krafton to take operational control of Unknown Worlds.

---

compelled to resign'" (citation omitted)). In line with this understanding, the EPA equates "constructive termination" with "dismissal." EPA Schedule II(vi).

[379] *See* JX 1304 (Expert Report of Ryan Bubb) ¶¶ 176-78 (explaining that the ordinary course covenant and Schedule II restrictions function to limit extraordinary actions while preserving the sellers' broad operational discretion over core business domains); *see also* Bubb Tr. 874-75.

[380] *See* Def.'s Post-trial Br. 37, 42; *see also* Post-trial Arg. Tr. 86, 98-100.

[381] Def.'s Post-trial Br. 37, 42; *see* EPA Schedule II(vii).

This argument is meritless. The EPA grants the Key Employees operational control over "employee matters" and product development.[382] Although Schedule II restricts unilateral changes to the company's executive officers, the Founders did no such thing. The individuals elevated to lead specific game projects—such as Kalina and Gallegos—were neither appointed as corporate executives nor designated Key Employees in the EPA.[383] They were game developers taking on project-level leadership.[384] Assigning these individuals to manage game development was a routine personnel decision that fell squarely within the Key Employees' retained operational control and did not require Krafton's consent.

### 3. The Good Faith Obligation

Section 2.7(f)(i)(C) of the EPA conditions the Key Employees' right to operational control on it being "reasonably exercised in good faith and in material compliance with applicable Law."[385] Krafton contends that the Key Employees breached this obligation when Cleveland and McGuire reduced their working hours

---

[382] EPA § 2.7(f).

[383] *Id.* § 1.1 (identifying only Cleveland, McGuire, and Gill as "Key Employee[s]").

[384] *See* Gill Tr. 17, 25, 38, 76, 78; Cleveland Tr. 694, 701, 718-20 (describing Kalina and Gallegos's promotions to game directors).

[385] EPA § 2.7(f)(i)(C).

and altered their duties.[386] Viewing the good faith condition through a "fiduciary lens," Krafton avers that stepping back from game development to focus on side projects constituted bad faith.[387]

This argument amounts to an attempt to inject a post-closing employment lock-up into the EPA. Contrary to Krafton's belief,[388] the EPA did not obligate the Founders to remain in their exact pre-acquisition roles indefinitely. They were free to leave, as shown by the EPA vesting operational control in the Key Employees so long as any one of them was employed.[389]

Cleveland and McGuire lacked ill intent when they transitioned their roles. Cleveland was burned out after *Moonbreaker*, and McGuire felt out of touch in an organization that had outgrown him.[390] Krafton frames their transition as a bad faith scheme to collect the earnout, pointing to Gill's encouragement that McGuire reduce his hours and "stay on the books" rather than resign outright.[391] But even if Gill

---

[386] Def.'s Post-trial Br. 10, 35-38. Krafton also argues that the data downloads breached this provision. As discussed above, the downloads were problematic but executed with the good faith belief that the Key Employees were protecting the company.

[387] Post-trial Arg. Tr. 99-100 (arguing for a "fiduciary lens" and asserting that Cleveland "get[ting] away with four hours on a film" was not in good faith).

[388] Kim Tr. 435-36 (testifying that he "thought the earnout period would be the lockup period" requiring Cleveland to be the Creative Director and McGuire to be the Technical Director).

[389] *See* EPA § 2.7(f); *see also supra* note 341.

[390] *See supra* notes 102-110, 120-124.

[391] Def.'s Post-trial Br. 10, 37-38; *see* JX 565 (McGuire's journal).

were acting with an eye toward preserving the earnout, Krafton has not shown that he acted in bad faith.

It is true that Gill reminded the Founders about the earnout while encouraging them to stay with Unknown Worlds. The EPA did not, however, eliminate the earnout if both Founders left. Their voluntary departures would merely reduce the revenue credited toward the earnout calculation by $1 million each.[392] Given Unknown Worlds' strong projections for *Subnautica* 2, this $2 million adjustment would have had a minor effect on the earnout.[393]

More broadly, it is reasonable for a CEO to encourage founders to transition into reduced advisory roles rather than departing. This arrangement allowed Cleveland and McGuire to retain ongoing ties to the company they created. They could serve the studio in different capacities—films for Cleveland, social impact for McGuire—while continuing to mentor the team.[394]

---

[392] EPA Ex. B § 1(f) ("In the event that the employment of any Key Employee with the Group Companies or any of their Affiliates is terminated voluntarily by any Key Employee, Group Company Revenue for purposes of any calculation under Section 2. 7 of the Agreement will be reduced by an amount equal to $1,000,000.").

[393] *See* JX 690A; JX 1199A; *see also* Gill Tr. 47 (describing the $1 million adjustment per Key Employee as about "2.5 percent of the deal" if both Cleveland and McGuire departed); JX 1304 (Expert Report of Ryan Bubb) ¶¶ 244–45 (calculating that a $1 million reduction for a departed Key Employee would reduce the maximum $250 million earnout payment by at most 1.3%).

[394] *See* Cleveland Tr. 700-01, 728-29; McGuire Tr. 335-36.

Openly transitioning duties to avoid the Founders' departures is not bad faith. A contractual "good faith" clause guards against arbitrary or unreasonable conduct intended to deprive the counterparty of the fruits of the bargain.[395] Krafton, having not contracted for an employment lock-up, suffered no such deprivation.

\* \* \*

Krafton failed to prove that the Key Employees breached the ordinary course covenant, the Schedule II restrictions, or the good faith obligation. It therefore lacked a valid contractual justification under Section 2.7(f) to remove their operational control. By nonetheless doing so while the Key Employees remained validly employed, Krafton breached the EPA.

## III. REMEDY

Krafton breached the EPA by terminating the Key Employees without Cause and wrongfully usurping operational control of Unknown Worlds. Fortis seeks specific performance of the EPA regarding the Key Employees' employment and

---

[395] *Hexion*, 965 A.2d at 749, 761 & n.125.

operational control. I first address the availability of specific performance before turning to the proper scope of relief.

## A. Whether Specific Performance Is Warranted

Fortis requests specific performance to restore the Key Employees to their employment, board seats, and operational control of Unknown Worlds.[396] In the EPA, Krafton guaranteed the Key Employees would retain operational control "in all material respects" during "the Relevant Period."[397] This operational control, Krafton promised, would include "product roadmap" and "launch."[398] Krafton also agreed that if it breached the EPA, the Key Employees would be entitled to specific performance to "enforce compliance" with its terms.[399]

Krafton argues that Fortis must make a "clear and convincing showing" of its entitlement to specific performance.[400] That is often the case. But where, as here, the parties contracted for specific performance, Delaware courts will enforce their

---

[396] PTO ¶ 122.

[397] EPA § 2.7(f) (promising operational control during the "Relevant Period"); *id.* § 1.1 (defining "Relevant Period" as "the four complete and consecutive calendar quarters during the Testing Period with the highest amount of total Group Company Revenue over such four complete and consecutive calendar quarters"); *id.* (defining "Testing Period" as "the period following the Closing through December 31, 2025").

[398] *Id.* § 2.7(f).

[399] *Id.* § 11.2 (stipulating that "the parties will be entitled to . . . specific performance . . . to prevent or restrain breaches or threatened breaches of this Agreement").

[400] Def.'s Post-trial Br. 58 (quoting *26 Cap. Acq. Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 464 (Del. Ch. 2023)).

bargain unless the breaching party presents a "persuasive" and "case-specific" reason not to.[401]

Even with a contractual stipulation, specific performance remains a matter of equitable discretion.[402] Specific performance is available where a party lacks an adequate legal remedy and establishes that (1) a valid contract exists; (2) it is ready, willing, and able to perform; and (3) the balance of equities tips in its favor.[403] The first element is undisputed; the EPA is a valid and binding contract. I turn to the remaining elements.

### 1. Lack of Adequate Remedy at Law

Krafton argues that specific performance is unavailable because Fortis has an adequate remedy at law.[404] To support this premise, it points to pre-litigation settlement discussions over the earnout dispute, insisting that the Key Employees' "true object is money."[405] Although Fortis seeks monetary relief for its earnout

---

[401] *L-5 Healthcare P'rs, LLC v. Alphatec Hldgs., Inc.*, 2024 WL 3888696, at *8 (Del. Ch. Aug. 21, 2024) ("But when a party has agreed to a provision like [a] specific performance clause, the party must establish a persuasive and case-specific reason why the clause should not be respected." (citation omitted)); *see Williams Cos. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at *2 (Del. Ch. June 24, 2016) ("Delaware is strongly contractarian, and the presence of a provision in favor of specific performance in case of breach, as the parties contracted for here, must be respected."), *aff'd*, 159 A.3d 264 (Del. 2017).

[402] *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 495 (Del. Ch. 2022).

[403] *See Osborn*, 991 A.2d at 1158.

[404] Def.'s Post-trial Br. 58.

[405] *Id.* at 58-59. The record belies Krafton's characterization of these negotiations. Buyout discussions arose during a period of escalating tension between the parties, which included

80

claims in Phase Two of this case, damages cannot provide Fortis with complete relief in Phase One.

The Key Employees' right to operational control over Unknown Worlds was a crucial, bargained-for protection.[406]  It guaranteed the Key Employees a long period of authority over the studio, including its "product roadmap, launch, [and] planning."[407]  Krafton stripped the Key Employees of this control by wrongfully terminating them, which deprived them of the freedom to guide Unknown Worlds consistent with their creative vision.[408]  The loss of such control, including over the launch of *Subnautica 2*, constitutes irreparable harm.[409]

---

Krafton suspending Unknown Worlds' access to its Steam publishing console.  *See supra* notes 209-211.  The Key Employees were not solely motivated by money; Gill emphasized that a condition of any buyout was ensuring "the team is in good hands."  JX 1190A at 2. Krafton relies on Gill's "just pay it" statement to Park, but context defeats this reliance. *See* Gill Tr. 94-96.  Krafton also claims the Key Employees rejected an "offer" to extend the earnout.  Def.'s Post-trial Br. 28-29.  Park merely stated she was "willing to help secure the adjustment" and, when pressed for details, admitted she was "not [t]here to talk about such details."  JX 856 at 6.

[406] *See* Bubb Tr. 873-74 (testifying that because Krafton had an economic incentive to depress revenue by delaying product launches, Section 2.7(f) was the "principal feature" used to protect the sellers by granting them operational control).

[407] EPA § 2.7(f).

[408] To the extent that this harm was suffered by the Key Employees, rather than to the former stockholders more broadly, I note that the EPA authorizes Fortis as a "Representative" to act as the sellers'—including the Key Employees'— "attorney-in-fact and exclusive agent" "in any and all capacities under [the EPA]."  EPA § 11.16(a).

[409] *Potter v. Cmty. Commc'ns Corp.*, 2004 WL 550747, at *3 (Del. Ch. Mar. 11, 2004) (finding irreparable injury from the loss of creative control over programming rights).

81

The text of the EPA bolsters this conclusion. The parties agreed that "irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of [the EPA]" was breached.[410] The Delaware Supreme Court has confirmed that such a provision should be honored unless a defendant can provide a "persuasive reason" to disregard it.[411] Krafton offered none.

## 2. Readiness to Perform

Krafton next argues that the Key Employees are not "ready, willing, and able to perform."[412] The Key Employees maintain they are not only ready but eager to return to Unknown Worlds.[413] I credit this testimony. The more difficult question is what roles, if any, they should resume.

By the time they were terminated, the Founders had left the daily rigors of game development. Cleveland was working no more than four hours per week on Unknown Worlds tasks, primarily exploring film adaptations.[414] McGuire was

---

[410] EPA § 11.2(a).

[411] *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1226-27 (Del. 2012).

[412] *26 Cap. Acq. Corp.*, 309 A.3d at 464 ("By definition, the remedy of specific performance contemplates that the parties will perform the contract, so the party seeking that remedy must be ready, willing, and able to perform."); *see* Def.'s Post-trial Br. 60 (quoting *26 Cap.*, 309 A.3d at 464).

[413] Gill Tr. 119; McGuire Tr. 258-60; Cleveland Tr. 753-54.

[414] *See supra* Section I.K.

focused on researching the effect of video games on children with autism.[415] Though both continued to offer valuable mentoring and high-level direction to the *Subnautica 2* team, they had purposefully stepped back from the studio's day-to-day work.

Gill, by contrast, carried the operational weight of Unknown Worlds. As CEO, he oversaw budgeting, managed personnel, and drove business development—all while serving as the primary liaison to an increasingly hostile parent company.[416] Krafton's executives levied no complaints about his dedication or performance, and internal Krafton communications even explored keeping Gill while ousting the others.[417] He was, by all accounts, a highly effective executive.

Equity favors a tailored solution. The irreparable harm is the Key Employees' loss of operational control over Unknown Worlds. The EPA requires that only one Key Employee be employed for that control right to persist.[418] Restoring Gill to his CEO position accomplishes that goal and vindicates the Key Employees' bargained-for rights.

---

[415] *See supra* Section I.K; *see supra* note 136.

[416] *See supra* notes 93-96, 137-138.

[417] *See* Park Tr. 487 (describing Gill's responsibilities as encompassing "planning, HR, like headcounts, financial budgeting, some biz development, partnership management," and "corporate operations management"); Gill Tr. 54; *see also* JX 1202 (June 9, 2025 Slack from Yoon to Kim outlining a scenario to "replace the other directors except for Ted"); Yoon Tr. 653-54.

[418] EPA § 2.7(f).

This measured relief does not require restoring Cleveland and McGuire to the non-operational roles they held at the time of their terminations.[419] The projects they were pursuing have value, and their historical contributions to the studio are profound. But compelling their formal return is unnecessary to remedy the contractual breach or protect Unknown Worlds' operational independence. Because Cleveland and McGuire had entrusted that authority to Gill, restoring Gill alone satisfies Section 2.7(f). Vesting Gill with the CEO's authority—including the discretion to retain Cleveland or McGuire as advisors—remedies the breach while respecting the studio's operational structure.

### 3.  Balance of the Equities

Having established that Gill stands ready, willing, and able to perform, I must ensure the balance of the equities favors this result. Krafton argues that specific performance would be inequitable because the Key Employees purportedly want nothing to do with Unknown Worlds after the earnout period ends.[420] Not so. Gill forcefully testified that he wants to return to the studio to "finish what [they] started" and "make a really positive impact" on the team.[421]

---

[419] They do not wish to return to the roles they held at the time of the acquisition.

[420] *See* Def.'s Post-trial Br. 61-63; *see also* Def.'s Pre-trial Br. 61-63.

[421] Gill Tr. 119-20.

Restoring as Unknown Worlds' CEO Gill will cause tension with the parent company given the obvious bad blood between the parties. But corporate friction does not excuse a material breach of contract.[422] Nor does it override a bargained-for specific performance clause. Krafton and Gill are sophisticated commercial actors. They can—and must—act in good faith to navigate their remaining contractual relationship.

The harm to Unknown Worlds absent specific performance is even more palpable. Unknown Worlds is being run by a part-time CEO who manages another studio and had never played *Subnautica* before his appointment.[423] Key staff members have quit, and the early access release of *Subnautica 2* has been put in jeopardy.[424]

On balance, the equities heavily favor restoring Gill to stabilize the studio. Before Krafton's intervention, *Subnautica 2* was on track for its intended early access release under Gill's leadership. Restoring his position and operational control will allow the studio to launch its highly anticipated game using the community-driven development model that made it successful.

---

[422] *See Bali v. Christiana Care Health Servs., Inc.*, 1999 WL 413303, at *6 (Del. Ch. June 16, 1999) (observing that although "the relationship between the[] parties is strained," it was "not so strained as to prevent" an award of specific performance).

[423] Papoutsis Dep. 72; JX 945.

[424] *See* Verrette Tr. 670-73; *see also* Pl.'s Post-trial Opening Br. 33, 56-58.

## B. The Scope of the Relief

As relief for Krafton's breaches, Fortis is entitled to specific performance restoring Gill as CEO of Unknown Worlds. This restoration carries a concomitant right to operational control under Section 2.7(f) of the EPA. Krafton's breaches and this litigation have cut into the period of operational control the Key Employees were promised. To replace that lost time, Gill's period of operational control will be extended by the duration of his ouster.[425]

Fortis also asks that I restore the Key Employees to their positions on Unknown Worlds' Board. On July 1, 2025, Krafton removed the Key Employees as directors and installed its own designees, who immediately resolved to remove the Key Employees as officers.[426] In Fortis's view, "to restore the [Key Employees] to operational control," I must also "return the [B]oard to its pre-termination composition."[427] I decline to do so. The Key Employees lack any entitlement to Board seats, and Krafton—as Unknown Worlds' sole stockholder—has the right to elect directors.

Still, the July 1 resolution is problematic insofar as it states that "*Subnautica 2* shall not be released for early access absent further review and the affirmative vote

---

[425] *See* Pl.'s Post-trial Reply Br. 36.

[426] *See* JX 964 at 3-5 (describing Unknown Worlds' new CEO Steve Papoutsis, and Krafton's Richard Yoon and Soyoung Han as directors, alongside Park).

[427] Pl.'s Post-trial Opening Br. 60-61.

of a majority of the Board."[428]   This resolution directly contravenes the Key Employees' retained authority over "product roadmap" and "launch" granted by the EPA.[429]   Because I am restoring Gill's bargained-for operational control, the July 1 resolution is declared ineffective to the extent it infringes on his contractual rights.[430] To ensure this award of specific performance is not illusory, Krafton is enjoined from using the Unknown Worlds Board, or any other corporate lever, to circumvent Section 2.7(f) or impede Gill's decision-making authority over the early access launch of *Subnautica 2*.  Krafton must also immediately restore to Gill all access necessary to effectuate that authority, including over the Steam publishing platform.[431]

---

[428] JX 964 at 4 (emphasis added).  The resolution attempts to justify this restriction by stating that the Board reviewed the game and agreed it "is currently not ready for early access release."  *Id.*  The trial record casts doubt on this finding and suggests it is pretextual. *See, e.g.*, Gill Tr. 107-08 (noting Krafton's own publishing team in El Segundo supported the release and was "super excited to be working with us on it"); Cleveland Tr. 745 (testifying that the game "looked totally amazing" and was ready).  Irrespective of the game's state of development, the EPA vests the contractual authority to make launch decisions with Gill.

[429] EPA § 2.7(f).

[430] *See Hanby v. Wereschak*, 207 A.2d 369, 370 (Del. 1965) ("[T]he Court of Chancery [has] the inherent powers of equity to adapt its relief to the particular rights and liabilities of each party."); *supra infra* note 431 (citing case law).  Fortis asks that I declare the resolution ultra vires.  Pl.'s Post-trial Opening Br. 61 n.7.  Although the Board had the authority to adopt the resolution, equity will not permit a parent company to use its subsidiary's board to evade its own contractual obligations.

[431] *See Hogg v. Walker*, 622 A.2d 648, 654 (Del. 1993) (explaining that the court has "broad latitude to exercise its equitable powers to craft a remedy"); *see also Rsrvs. Dev. LLC v. Severn Sav. Bank, FSB*, 961 A.2d 521, 525 (Del. 2008) ("The Court of Chancery has broad discretion to fashion equitable relief.").  In granting this relief, I do not intend to deprive

The original earnout window—defined in the EPA as the "Testing Period"—was set to expire on December 31, 2025, subject to Fortis's unilateral option to extend it to June 30, 2026.[432] Because Krafton's breach wrongfully deprived the Key Employees of operational control during this window, Fortis's request to extend the earnout period is granted.[433]

When fashioning a specific performance remedy, this court has the broad equitable authority to extend contractual timeframes to ensure the remedy is complete and the non-breaching party receives the benefit of its bargain.[434] To afford the sellers a genuine opportunity to achieve the earnout under Gill's restored leadership, the Testing Period is extended by the duration of Gill's ouster.[435] The

Krafton of its rights as Unknown Worlds' sole stockholder, provided those rights are not exercised to circumvent Section 2.7(f) or thwart the specific performance ordered in this opinion.

[432] EPA § 1.1 (defining "Testing Period"); *id.* § 2.7(b)(iii) (detailing the extension option).

[433] PTO ¶ 122(c).

[434] *See Bryan v. Moore*, 863 A.2d 258, 260-61 (Del. Ch. 2004) (extending a transactional performance deadline to effectuate specific performance); *see supra* notes 430-431 (citing case law). This equitable power is routinely employed to extend time-bound periods by the exact duration of a breach. *See, e.g.*, *Heartland Payment Sys., LLC v. InTEAM Assocs., LLC*, 171 A.3d 544, 570-71 (Del. 2017) (affirming the extension of a contractual period by 18 months to account for a breach of the same duration); *cf. Arxada Hldgs. NA Inc. v. Harvey*, 2026 WL 220511, at *32-33 (Del. Ch. Jan. 28, 2026) ("A court can extend a restrictive covenant to replace the period during which a party was in breach.").

[435] *See* EPA § 1.1 (defining "Maximum One-Year Revenue" and "Relevant Period"). The EPA calculates the earnout based on the four consecutive calendar quarters with the highest revenue during the Testing Period. By ousting Gill for over eight months, Krafton deprived the sellers of the pre-release runway to launch the game and capture four consecutive quarters of post-release revenue before the contractual window closed. This equitable extension ensures that the specific performance remedy is not illusory. *See Tri State Mall*

base December 31, 2025 earnout deadline is therefore extended by 258 days, equal to the period between Gill's termination and this opinion, which establishes a new base deadline of September 15, 2026.[436] Furthermore, Fortis retains its contractual right under Section 2.7(b)(iii) of the EPA to unilaterally extend the Testing Period by an additional six months (to March 15, 2027) upon written notice to Krafton.[437]

Even with this equitable extension of the Testing Period, the litigation is not over. The remaining open questions include whether Krafton breached its promise not to "take any actions [with] the primary business purpose of . . . depriv[ing]" the

---

*Assocs. v. A.A.R. Realty Corp.*, 298 A.2d 368, 371-72 (Del. Ch. 1972) ("[T]he Court in decreeing specific performance will adjust the equities of the parties in such a manner as to put them as nearly as possible in the same position as if the contract had been performed [a]ccording to its terms."); *Fortis Advisors LLC v. Johnson & Johnson*, 2024 WL 4048060, at *50 (Del. Ch. Sept. 4, 2024) (explaining, in the context of an earnout case, that "[o]nce liability [for a breach] is established, 'this court has broad discretion to tailor a remedy to suit the situation as it exists'" (quoting *Gilliland v. Motorola, Inc.*, 873 A.2d 305, 312 (Del. Ch. 2005))), *aff'd in part, rev'd in part on other grounds*, —A.3d—, 2026 WL 89452 (Del. Jan. 12, 2026).

[436] The duration of this equitable extension is calculated by measuring the period from the date of Gill's wrongful termination on July 1, 2025, to the date of this opinion restoring his operational control on March 16, 2026. This period spans exactly 258 days. Adding 258 days to the base Testing Period deadline of December 31, 2025 yields an equitably extended base deadline of September 15, 2026.

[437] EPA § 2.7(b)(iii). Fortis has the "sole discretion" to extend the Testing Period to June 30, 2026 (or, as equitably extended here, March 15, 2027) "by delivering written notice to [Krafton] within 10 Business Days following the Initial Revenue Determination Date." *Id.* Because Krafton breached the EPA, the normal timeline for calculating the initial revenue and hitting that "Determination Date" has been frustrated. Because the base Testing Period has been equitably extended, the corresponding Initial Revenue Determination Date and the window for Fortis to deliver its written notice are equitably extended in tandem. Should Fortis give such written notice, the Testing Period will be extended through March 15, 2027.

89

sellers of the earnout,[438] and whether Fortis is entitled to money damages for earnout revenues permanently lost due to Krafton's breaches and litigation delays. I will resolve them in Phase Two.

## IV. CONCLUSION

For the reasons explained above, judgment is entered in favor of Fortis on its Phase One claims. Krafton breached the EPA by terminating the Key Employees without valid Cause and by improperly seizing operational control of Unknown Worlds.

To remedy these breaches, Fortis is entitled to specific performance. Edward Gill is hereby reinstated as CEO of Unknown Worlds, and his period of operational control under Section 2.7(f) of the EPA will be extended by the time that elapsed between his wrongful termination and his restoration. The July 1, 2025 Board resolution is declared ineffective to the extent it infringes on Gill's operational control right. Krafton is enjoined from circumventing Section 2.7(f) or impeding Gill's authority over the early access launch of *Subnautica 2* and must immediately restore his access to the Steam platform. Finally, the base earnout Testing Period is equitably extended by 258 days to September 15, 2026, and Fortis retains its contractual right to further extend the Testing Period to March 15, 2027.

---

[438] *Id.* § 2.7(e).

Within three business days, the parties are directed to confer and submit a proposed form of partial judgment implementing this decision.  In addition to the matters remaining for Phase Two, the court will retain jurisdiction to enforce the specific performance order.